## WILLIAM J. McCARTY ET AL. *vs.* HENRIETTA HAMBURGER, EXECUTRIX, ET AL.

*Exceptions to Ratification of Mortgage Sale.*

One of the exceptions filed to the ratification of a mortgage sale alleged that a certain person had circulated false reports in the neighborhood to the effect that the title to the property was defective, in consequence of which intending purchasers were prevented from making bids at the sale. *Held,* that since there is no evidence that the title was in fact defective, or that any person was restrained from purchasing or bidding on the property on account of the alleged rumor, this exception affords no ground for vacating the sale.

Another exception alleged that the sale was not fairly conducted and that the property was sold for an inadequate price. Upon an examination of the evidence, *held,* that the trustee making the sale acted throughout in good faith and fairly, with due regard to the interests of the mortgagor, and that the price for which the property was sold was not grossly inadequate.

*Decided January, 11th, 1910.*

Appeal from the Circuit Court for Allegany County (KEEDY, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and THOMAS, JJ.

*R. W. McMichael* (with whom was *D. J. Blackiston* on the brief), for the appellants.

*Ferdinand Williams* (with whom were *David A. Robb* and *James A. McHenry* on the brief), for the appellees.

BRISCOE, J., delivered the opinion of the Court.

The mortgage sale in this case was reported on February 3rd, 1909, in the Circuit Court for Allegany County, by Mr. Robert H. Gordon, the attorney named in a mortgage from Margaretta McCarty to Mary E. Gordon, Robert H. Gordon and Seligman Hamburger, all of Allegany County, Maryland, and the report states that the sale was made after default, at public auction, to George H. Longerbeam of the City of Cumberland for the sum of ten thousand dollars.

The mortgage was executed on the 10th day of June, 1903, to secure the payment of an indebtedness of nineteen hundred dollars to Mary E. Gordon, the sum of four hundred dollars to Robert H. Gordon, and the sum of fifteen hundred dollars to Seligman Hamburger, and at the date of the sale repeated defaults had been made in the payment of the interest.

The property conveyed by the mortgage is stated to contain about eleven hundred acres, situate, lying and being on the North Branch of the Potomac river above the City of Cumberland, in Allegany County, and known as "The Black Oak Bottom Farm." The property was at the request of the mortgagees duly advertised by the attorney, in the Cumberland "Daily Times," a newspaper published in the City of Cumberland, and by hand bills distributed by the attorney, as a mortgagee's sale of one of the most valuable farms in Allegany County. The advertisement contained a further description, to wit: "This farm consists of about three hundred acres of Potomac river bottom land, with a lime stone base and about six hundred acres of limestone mountain woodland much of it admirably adapted to fruit trees and orchards. The land produces blue grass naturally and the bot-

tom has long been known as the best corn-producing land in Western Maryland. The Baltimore and Ohio and the Western Maryland railroads both have a station immediately adjoining this farm. There are two houses, the old homestead and a tenant house. There are stables and other buildings and each field is well watered, the Potomac river skirting one side of the farm. It is about six miles from Keyser and fifteen miles from Cumberland. There are massive beds of lime stone on the property convenient to the Baltimore and Ohio Railroad."

This property and improvements were sold by the attorney in its entirety at public sale, in front of the Third National Bank in the City of Cumberland, on the 30th day of January, 1909, after the property had been exposed for sale for the period of one hour and ten minutes.

Subsequently, on the 6th of March, 1909, certain objec-tions were filed to the ratification of the sale by the appel-lants, Wm. J. McCarty and Mary S. McCarty, assignees of Margaretta McCarty, mortgagor.

They are substantially as follows:

First. That the price at which the property was sold, was a totally inadequate one and greatly less than the value of the same and far less than the property would have brought had the sale been properly and fairly made.

Second. That at and before the time at which the sale took place, a certain person, to these exceptants well known, falsely and maliciously and for the purpose of preventing persons desiring and intending to bid for the property at the sale circulated a report throughout the neighborhood where the intending bidders resided that the title to the property was defective and that the Court or the mortgagees could not give a good title to the purchaser of the property, thus pre-venting the intending bidders from attending the sale and bidding on the property; and

Third. And for other good and sufficient reasons to be ad-duced, at the hearing of these exceptions.

These exceptions were overruled on hearing by the Circuit Court of Allegany County on the 25th day of March, 1903, and the sale finally ratified and confirmed. And from this order, an appeal has been taken.

We do not regard either one of the objections urged against the ratification of the sale as sound or supported by the evidence set out in the record.

There was no evidence to sustain the third objection and it is sufficient to say, it will not be considered.

The second objection, is also without merit and untenable. It is based, upon a statement that a certain person falsely and maliciously circulated a report in the neighborhood that the title to the property was defective and a good title could not be given the purchaser, whereby intending bidders were prevented from attending the sale and bidding.

It does not appear from the evidence that any *bona fide* purchaser or any person with means was prevented from purchasing the property by reason of the alleged rumor. It is not asserted in what respect the title was defective, except a bare statement made after the sale to the effect that the purchaser could not get the farm, "because it was willed to the children." There is nothing in the record to show that the title is defective or that any person with any serious intentions of purchasng the property was either prevented from attending the sale or bidding thereon in consequence of the alleged report that the title was defective. On the contrary, the witnesses Brady and Seymour who testify as to this rumor were not influenced or affected by it. They both state they heard the rumor before the sale. The former advised several persons to purchase the farm and the latter claims he is willing, since the sale, to give more than ten thousand dollars for the farm. The witness Llewellyn who, it is alleged, was prevented from buying the farm because the title was "bad," stated that he was not able to purchase it. He testified, "if I had the money I would give $15,000 for it myself;" and Mr. Seymour was the only man so far as he knew, who was willing to give that sum for it. Such testimony is

entirely too vague, indefinite and inconclusive, in the absence of proof indicating fraud or collusion on the part of either the attorney or the purchaser, to *disturb* or vacate a sale fairly made. The purchaser alone would be injured by a defect of title if any, and in this case there is no complaint whatever from him.

The remaining questions arise upon the first exception, and they are practically: was the sale fairly made and for a price that ought to be approved by the Court?

Upon a careful review of the whole case, we are all of the opinion there is nothing in the record to show a doubt or cast suspicion upon the fairness of the sale, or to reflect upon the conduct of the attorney who made the sale or the purchaser of the property. In no view of the evidence can we perceive such inadequacy of price as would justify the rejection of the sale.

There is some conflict in the testimony and difference of opinion among the witnesses as to the value of the farm, but the highest offer on the day of sale, was ten thousand dollars. Some of the witnesses place the value of the property at $10,000, others at $15,000, and the owner, was willing to accept $13,000. The property had been divided into lots, and offered at private sale, and a bid of $13,000 therefor had been declined, at the request of the owner. Subsequently, it was advertised at public sale under the mortgage under the conditions and with the result herein stated.

The settled principle upon which Courts act in dealing with sales like the present one is too well recognized to admit of discussion. In *Carroll* v. *Hutton,* 91 Md. 380, it was said, a judicial sale, *bona fide* made, will not be set aside because of difference of opinion, among witnesses as to the value of the property unless the price reported is so grossly inadequate as to indicate misconduct on the part of the mortgagee or purchaser.

This subject is fully discussed and the rule appled by the Court in a number of cases: *Cohen* v. *Wagner,* 6 Gill, 236; *Johnson* v. *Dorsey,* 7 Gill, 269; *Warfield* v. *Ross,* 38 Md.

85; *Garritee* v. *Popplein,* 73 Md. 322; *Banks* v. *Lanahan,* 45 Md. 396; *Chilton* v. *Brooks* 69 Md. 584; *Thomas* v. *Fewster,* 95 Md. 448.

Applying these well established rules, to the case at bar, we think it is clear upon the proof that the alleged inadequacy of price is not of a character to authorize the vacation of this sale.

Mr. Gordon, the attorney named in the mortgage, appears to have acted in entire good faith and to have fully discharged his duties under the terms of the power of the mortgage.

In the case of *Learned* v. *Geer,* 139 Mass. 32, it was held, that if a mortgagee acts in good faith and fully conforms to the terms of his power a Court will not set aside a sale because it is a hardship upon the mortgagor. The hardship, if any, results from the contract of the mortgagor and a Court cannot relieve him from it without violating the rights of the mortgagee.

There is no force in the contention that Mr. Seymour, an alleged *bona fide* intending purchaser was kept from the sale by false reports and representations of the mortgagee's attorney, that he desired the property to sell for $15,000. While it is true, the attorney stated, he desired the property to sell for $15,000, yet the witness was not willing to say the impression made upon him was that it would not be sold for a less sum if this amount could not be procured. The fullest opportunity was offered him to attend the sale and to bid for the property if he so desired. He will not be heard or permitted, at this late date to allege his own neglect or inattention, as the cause of his mistake, or his having been misled, if misled at all, by so slight a circumstance.

A sale of this character when fairly and regularly made will not be disturbed upon such narrow or technical grounds.

The conduct of Mr. Gordon, in the whole transaction, appears to be entirely free from any charge of bad faith, and there is no evidence whatever that can by any reasonable hypothesis be construed into an imputation of fraud, miscon-

duct, unfairness or mistake, in the sale, on the part of either the attorney who made the sale or the purchaser.

Inadequacy of price, standing by itself is not sufficient to vacate a sale, unless it be so gross and inordinate as to indicate mistake or unfairness for which the purchaser is responsible or some misconduct or fraud by the attorney who makes the sale. The testimony of Mr. Gordon is very clear and conclusive, as to his efforts to procure bidders, and his good faith, in making the sale. It is as follows: "The interest on the mortgage in which I had been named as attorney had been overdue for a considerable time, and one of the mortgagees named in the mortgage was constantly after me to either collect the interest or sell the property as attorney. That was all during the spring and summer of 1908. I tried to postpone it as long as I could, and I told Mr. McCarty that something would have to be done, that the parties were insisting on the payment of the interest and finally he consented to have me advertise the property as attorney for Mr. McCarty and his wife as the owner. We thought we could probably sell to better advantage by dividing it into two parts. I went up on the property with Mr. McCarty and formulated a description for a division of the property and then advertised the property for sale as an entirety and in two parts as will be shown by a copy of the advertisement which I will file. I had a number of bills struck off and sent bills to Garrett County to friends of mine, up to Moorefield, to be placed in Somerset County in Pennsylvania and tried to locate people that were likely to buy farms. Mr. McCarty and I worked together in connection with this matter. We offered the property for sale and on the day of the sale we had a bid of $13,000 for the property as an entirity and something less I think than $11,000 for the two parts. I am not positive about the figures. After having it cried for a long time, Mr. McCarty talked to some of his friends about the bid of $13,000 and they did not seem to think it enough. I hoped to get more than that for Mr. McCarty and he thought if we withdrew it we could get more at private sale.

I concurred in this and was under the impression that we might be able to do better. The sale was then withdrawn and from that time on for the next three months or more we tried to find purchasers at private sale. I had the matter up with a number of people. I went to see Mr. Reynolds who had made the bid of $13,000 on the day of the sale to try and see if his party wouldn't increase the price. I also saw Mr. Seaver and he thought he had a party. He afterwards advised me that he could not do anything with it. I subsequently found or least so understood that the party who had bid $13,000 through Mr. Reynolds was the party Mr. Seaver had in mind, Mr. Fesenmier, and that he had gotten out of the notion of buying the property. I then found that there was practically no chance of selling at private sale, and I told Mr. McCarty that the only thing I thought to be done was to put it up under the mortgage and sell it. The property was then advertised, the bills were struck off, I talked to everybody I saw about it that I thought would be interested. Saw Mr. Charlie Seymour on the road to Keyser on the train, talked to him about it and told him that I thought it was a valuable property and I saw his brother up there that day, Mr. Aaron Seymour that day. Mr. Aaron Seymour came down to my office that same afternoon or the next day— I understood he was looking for a farm—and I talked to him a good while about it and told him I thought the farm ought to be worth about $15,000. I did not tell him that I would not sell it for less than $15,000, because I had no power to fix the price, and in addition to that Mr. McCarty told me he was willing to sell it at $13,000 whenever he could get it in order to have the matter closed up. The interest was accumulating and he was anxious to have the matter settled. Mr. Seymour got a couple of the sale bills from me and promised me he would be over on the day of the sale. That was the last I heard of him. I carried a bunch of the small bills in my pocket for some little time before the day of the sale and handed them out personally to people I saw and thought would be probably interested. On the day of the

sale the weather was inclement. The wind was blowing and I think there was some little snow flying, very much such a day as today, probably a little colder. It was a blustery raw day. I know I had not been well and I alternated between the outside and the bank room myself. Mr. McCarty was there when the sale first started and I did not see him afterwards. The sale was continued for over an hour. It was knocked down to Mr. Longerbeam. That afternoon Mr. Longerbeam came to me and said he didn't want to take this property. He said he wouldn't pay the money. I then did not know what to do. I went to see Mr. McHenry who represented the German Savings Bank and see whether they would take the property off of Mr. Longerbeam's hands for $10,000 and was making some arrangements looking towards that end, but before I was notified in regard to that, I saw Mr. Robert Shriver of the First National Bank and tried to get to see if they wouldn't take it in Mr. Longerbeam's place. I went to see Mr. Shriver because his bank was the holder of some unsecured paper of Mr. McCarty's and I thought I would get them interested in it for that reason. He waited until he saw one of the directors and then advised me that they would not touch it. I think it was on the Tuesday following Tuesday that Mr. Longerbeam came in and paid the $1,000 and then I reported the sale. When Mr. Longerbeam advised me afterwards we had some conversation over the phone and I told Mr. Longerbeam that if he did not come up and comply with the terms of the sale, that I would immediately get an order of the Court authorizing a resale of the property at his risk, and subsequent to that conversation he came over and complied with the terms of sale by paying $1,000, the balance to be on day of ratification. I was compelled to do this because I thought I had exhausted the power contained in the mortgage and might make myself resonsible if I failed to get the sanction of the Court.

Q. Can you state how far the proceeds of sale wi'l go toward satisfying the liens against this property?

A. I could not exactly. It would take all I think to satisfy the liens at the present time I think. I worked harder at that sale than any other sale before in my life, and this I did on account of my personal friendship towards Mr. McCarty and his wife.

Q. I suppose in your twenty years' practising at the bar you have had plenty of experience in regard to judicial sales?

A. I have been at the bar over 35 years and have had some experience with sales."

We are convinced upon a careful examination of the whole case that Mr. Gordon acted in the utmost good faith in making this sale, and there being no just ground to doubt the propriety of the sale and there being no valid objections against it, the decree of the Court below, overruling the exceptions, and ratifying and confirming the sale, will be affirmed. The costs in the Court below to be paid as directed by the decree, the costs in this Court to be paid by the appellants.

> *Decree affirmed, costs in the Court below to be paid out of the fund in the hands of the attorney, the costs in this Court to be paid by the appellants.*