JONAS HERMAN ET AL. *vs.* MONDAWMIN BUILD-ING AND LOAN COMPANY.

*Foreclosure Sale—Inadequacy of Price—Stifling of Bids—Rescission—Bond on Appeal—Effect of Reversal.*

The inadequacy of the price obtained at a sale under a mortgage *held* not to have been so great as to require the rejection of the sale on that ground alone, if the sale was duly and fairly made under proper conditions.                    p. 484

The indorser on a note secured by a second mortgage *held* to have been influenced by the holder of the note to refrain from bidding at a sale under the first mortgage, with the result that the holder of the note purchased the property at an inadequate price, and one insufficient to relieve such indorser from liability on the note, the only competing bidder being the first mortgagee, whose primary interest was to protect his own claim.                                    pp. 484-488

While one who voluntarily refrains from bidding at a sale at the solicitation of the eventual purchaser may not be able

to question the validity of the sale on that ground, the objection being based on his own acquiescence, a mortgagor, whose interests are prejudiced by a sale for an inadequate price, is entitled to urge the purchaser's interference with the freedom of the sale as a valid reason for its rejection. p. 489

That the holder of a note, secured by a second mortgage, and an indorser thereon, have a mutual interest in the mortgage, does not validate an agreement between them in restriction of the bidding at a sale under the first mortgage, to the extent that the mortgagor may not, after the sale and the indorser's repudiation of the agreement, ask the recission of a purchase by the holder of the note, effected by means of such agreement. p. 489

The rule that no appeal from a decree or order in equity shall stay its execution or suspend its operation, unless a bond is filed by the appellant, is not available to protect the title vested under a purchase, although ratified by the court, if it was unfairly accomplished, as by inducing another to refrain from bidding. p. 490

*Decided April 10th, 1924.*

Appeal from the Circuit Court of Baltimore City (CARROLL T. BOND, J.).

Petition by the Mondawmin Building and Loan Association of Baltimore City against Jonas Herman and Claire M. Herman, his wife, for the foreclosure of a mortgage. From an order overruling exceptions to a sale made by a trustee appointed by the court for the purpose, the said Jonas Herman and Claire M. Herman appeal. Reversed.

The cause was argued before THOMAS, PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*John Watson, Jr.,* and *Edward J. Colgan, Jr.,* with whom was *Howard T. Murray* on the brief, for the appellants.

*O. Parker Baker* and *Benjamin B. Snyder,* for the appellee.

URNER, J., delivered the opinion of the Court.

In pursuance of a decree by consent under the provisions of a mortgage, certain real estate in the City of Baltimore was sold at public auction. The question on this appeal is whether exceptions to the ratification of the sale were properly overruled.

The property sold under the decree is situated at the southeast corner of York Road and Radnor Avenue. It consists of two adjacent lots of ground, one of which is vacant and the other improved with an apartment house. The trustee who made the sale, and who had been substituted for a trustee originally appointed by the decree, reported that, having received no bid for the improved lot when offered separately, he sold the property as a whole to the highest bidder for the sum of $19,000.

The decree for the sale was entered under a first mortgage, for $14,000, from the appellants, Jonas Herman and wife, to the Mondawmin Building Association, which subsequently assigned it to John F. Steinmetz. A second mortgage, for $8,000, was given by Herman and wife to the appellants, George Schissler and wife, from whom Herman had purchased the property. Schissler and his wife assigned the second mortgage to Benjamin Brown and indorsed the promissory note which it secured. Brown became the purchaser of the property at the sale under the decree. The exceptions to the sale were filed by Herman and wife as mortgagors, and by Schissler and wife on account of their interest as indorsers of the second mortgage note.

The exceptions assert that: (1) The first mortgage was not in default. (2) The property was sold for a grossly inadequate price. (3) One of the persons attending the sale, and who would have paid a higher price, was persuaded by the purchaser to refrain from bidding. (4) The substituted trustee, in making the sale, did not comply with the terms of the order by which he was appointed. (5) The statement of the mortgage claim filed in the proceeding was not properly verified.

As to the first ground of exception it is sufficient to say that the mortgage appears from the record to have been in default even if a charge which is alleged to be usurious is rejected.

Upon the question as to the adequacy of the price reported, it was testified by Herman that he bought the property from Schissler in the summer of 1922 for $27,000, and that he converted the building, then standing on one of the lots, into a five apartment house at a cost of approximately $8,000. In his opinion the property should have been sold for $30,000, including the unimproved lot. William R. Patterson, the real estate broker who had negotiated Schissler's sale of the property to Herman, stated that in his judgment it was worth from $28,000 to $30,000. According to Schissler's testimony he would have bid as much as $25,000 at the sale, if he had not been dissuaded under the circumstances to be presently mentioned. But since the sale he has not been willing to make such an offer. His daughter, who said she had dealt in real estate, and had valuable interests of her own, testified that she thought the property could be sold for $24,000 and that she would buy it herself for $20,000 if given time to finance the transaction. David Kennedy, Esquire, testified that, acting as attorney for Schissler, he made an offer of $22,000 for the property to Brown, the purchaser, that sum being sufficient to pay the amounts due on both mortgages. This offer, he said, was refused by Brown, who stated, however, his willingness to sell for $25,000.

Mr. Steinmetz, the assignee of the first mortgage, estimated the property at "$15,000 as a speculative value and $20,000 as an investment value." Allen L. Jamison, a real estate broker, who was present at the sale, and who was called as a witness by the purchaser, valued the property at $20,000.

It was testified by Brown, the purchaser, that prior to the sale he told Schissler the property would have to be sold for $22,000, in order to protect the latter from liability for the payment of the second mortgage, and in the same interview said he thought the property was worth that amount.

All of the witnesses estimated the real value of the mortgaged property to be in excess of the price at which it was sold by the trustee. The valuation placed upon it by the purchaser's own witnesses was $20,000, while the purchaser himself advised the assignor of the second mortgage, before the sale, that it was worth $22,000, and declined after the sale to sell it for that price. The sale appears, therefore, to have been made for a price which was inadequate. But the deficiency is not proved, by the weight of the evidence, to be so great as to require the rejection of the sale on that ground alone, if it was duly and fairly made under proper conditions. *Hilton Park Co.* v. *Gary,* 133 Md. 509; *Evans Marble Co.* v. *Abrams,* 131 Md. 204; *Boyd* v. *Smith,* 127 Md. 359; *Hunter* v. *Highland Land Co.,* 123 Md. 644; *Edgecombe Park Co.* v. *Finney,* 121 Md. 320; *Vollum* v. *Beall,* 117 Md. 617; *Robertson Co.* v. *Chambers,* 113 Md. 232; *McCarty* v. *Hamburger,* 112 Md. 40.

It is contended that the other grounds of exception, considered in connection with the inadequacy of the price, would justify a decision that the sale should be vacated. The next inquiry to be made, therefore, is whether the testimony supports the charge that the purchaser induced another bidder to abandon his purpose and effort to buy the property. If a wrongful interference with the freedom and fairness of the sale occurred, with resulting prejudice to the exceptants' interests, they have a legitimate ground upon which to ask that the sale be abrogated. *McLane* v. *McLane, ante* p. 186; *Chew* v. *Baker,* 133 Md. 637; *Loeber* v. *Ecker,* 55 Md. 1.

The issue of fact which we have now to determine is whether Schissler, who made one bid at the sale, was influenced by Brown, the purchaser, to withdraw from the competition. It is proved beyond doubt that Schissler attended the sale with a view to the protection of himself and his wife against their liability as indorsers of the note secured by the second mortgage which they had assigned to Brown. It was necessary that the property should be sold for not less than $22,000, in order that both the first and second mortgages

might be fully paid out of the proceeds. In describing the occurrences at the sale Schissler testified: "When I got down there Benjamin Brown, the one that bought the second mortgage from me, comes over on the side there and asked me whether I was going to buy the property, and I said, I am. Do you think it is going to bring $25,000? I says, Sure. I won't let it go for that. So then, when the sale started and I goes over to listen at the auctioneer Benjamin Brown turns around and says, Don't bid agin me, I will bid it in between us two. It kind of struck me, I didn't know what to say, and he goes to work and offers $19,000 and the auctioneer knocked it down to him." The next day he received a letter, which he offered in evidence, demanding payment of the second mortgage debt and interest. Further testifying, Schissler said: "I thought, of course, having the second mortgage he would bid it in to protect me too. He bids $19,000 and the auctioneer knocked it down to him, and the next morning I get this mail." When asked on cross-examination how much he would then be willing to pay for the property, he said: "That is another question. At the sale I would not let it go at $25,000 but now it is all mixed up. I was there to buy it in, and if it had not been for Benjamin Brown I would have it, too." Q. You made an arrangement with Ben Brown by which he was to bid and you were to bid it between you, is that right? A. How is that? Q. You were to buy it between you, it was to be your property as well as his, and he bid it in? A. That is what he told me. Whether it was or not I couldn't say. I was studying and while I was studying he offered $19,000 and he got it. Q. How much was it started at? A. I think $16,000 the first bid. Q. $15,000? A. That is right, and I bid sixteen. Q. You bid sixteen? A. Yes, sir. Q. In violation of that contract? A. Oh, no; before that. When I bid sixteen he turned around and says, Don't bid agin me, I will bid it in between us two. Q. You agreed to that? A. I didn't agree. I didn't know what to say, and while I was studying around he offered $19,000 and it was knocked down to him. Q.

Your understanding was that he was buying it in for you?
A. I supposed so. I didn't know how he meant it, but the property should never have gone for $19,000, because I would have given as high as $25,000. Being asked again whether he would then give $25,000 for the property, he said: "No, not after they go to work and leave me out that way."

Miss Lillie Schissler, daughter of the preceding witness, testified as to a telephone interview with Brown, just before the sale, which she narrated in part as follows: "He says, is your father going to be there? I said, Yes, sure, he is going to be there to protect his mortgage. He says, you tell your father I would like to see him before the sale to have a talk with him. I said, where do you want to see him? I can get in touch with him now. He says, No, it will be all right. Let him get there before the sale, on the premises half an hour before the sale. I told my father, and he was there." Mr. Brown arrived, she said, about ten minutes before the hour for the sale, and he and her father had a conversation which she heard. "I was about five feet from him," she said, "and I heard the talk. He said to my father, Mr. Schissler, how about it, and he said, Well, listen. I guess that meant connected with the phone message, he wanted to see him. I judge that was about what it was, he says, Mr. Schissler, don't you bid against me, let me do the bidding, and I will bid it in between us together, and I walked away, and I thought it was going to be all right * * *. And Mr. Brown went through the house. * * * When he came out he seemed to be pleased over it. Then the sale went on and my father did bid, because it was hard to get any bids there, because there were no crowds there—half the time the sign was down—and there were not many people there. * * * Of course, then after the sale went on, you know, the auctioneer kept looking at Mr. Brown, you know, to make the bids, * * * and towards the last it looked funny—at $19,000 it went so quick to Mr. Brown, I rushed out to my father and I said, why don't you bid—

bid? Of course the reason I said that I thought it was something funny, they were not going to protect him anyhow."

Mr. Schissler's son, William, testified that he was at the sale, and that a few minutes before it started Mr. Brown "came out on the porch" and said to Mr. Schissler: "Don't bid against me." The witness said: "My father turned around. I stood there and I tried to tell him he had to protect his mortgage, but Mr. Brown had such a hold on him, he had so much trust in him, that my father just took his word for it, and he was so bewildered he don't even know now. Q. You heard Mr. Brown ask him not to bid against him? A. Yes. Q. What did he say he would do? A. I didn't hear my father say nothing. Q. What did Mr. Brown say? A. He says, Don't overbid me. Q. Did he say why? A. No, he didn't say why; my father made a bid and he turns around and tells him, Don't over bid me. Q. Did you hear anything of the first conversation? A. I heard part of it. Q. What did you hear? A. Mr. Brown walked over to my father and said, Lets buy it in between us; and then of course I walked away when they started to talk and came up on the porch."

Mr. Kennedy, who was counsel for Schissler but was not at the sale, testified that he had no interview with Brown, after his demand on Schissler for the payment of the second mortgage, and that he said: "Mr. Brown, I don't understand this. Mr. Schissler claims you bought the property in for him, and such being the case he would not owe you anything until the matter was settled up, to see whether he had any loss on it or not. He said, No, I bought it for myself. He said, after the sale I told Mr. Snyder (his attorney) and myself told Mr. Schissler that I had purchased it on my own account and not for the two of us." The offer of $22,000, previously mentioned, was then made by Mr. Kennedy on behalf of his client and was declined.

It was denied by Brown, in his testimony, that he had asked Schissler not to bid at the sale or had promised that the purchase would be made for their joint benefit. While the sale was in progress, he said, "Mr. Schissler several times

tried to get my attention to get me to come over and speak
to him, and I told him to let me alone." He testified: "I
had no conversation with Mr. Schissler at the time except I
told him to let me alone at the time of the sale, I didn't
want to be interrupted."

Benjamin B. Snyder, Esquire, attorney for Brown, at-
tended the sale, and was with his client "95 per cent. of the
time." He had no personal knowledge, he said, of any con-
versation there between Brown and Schissler.

Mr. Jamison, who went to the sale with Brown, but whose
description of their movements shows that they were not
always together, testified that he did not know of any inter-
view between Brown and Schissler on that occasion. No
witness other than those already referred to gave any testi-
mony on the subject.

It is not necessary to decide whether or not there was a
definite agreement between Brown and Schissler that the
former should bid alone, but for their joint interest, at the
sale reported in this proceeding. But unless we disregard
what in our opinion is the preponderance of the affirmative
testimony, we must conclude that Schissler was influenced
by Brown to desist from bidding.

The chief purpose of Schissler's attendance at the sale
apparently was to protect himself from loss on account of
the second mortgage by ensuring a sale of the property for
a price at least sufficient to satisfy that indebtedness after
the payment of the prior mortgage claim. A sale for less
than $22,000 would leave a balance due on the second mort-
gage for which he would remain personally liable. It was
plainly to his interest to advance his offer to the extent
necessary to prevent such a loss. In view of his belief, and of
the proof, as to the value of the property, it seems hardly
probable that he would have discontinued his bidding and
allowed his interests to be sacrificed by the sale of the prop-
erty at an inadequate price, if the inducement to which he
and his witnesses testified was not in fact offered. The
weight of the evidence, increased by the strong probabilities
of the case, require us to conclude that the sale was made for

less than the real value of the property because of conduct by the purchaser which obviated the competition of another bidder. After Schissler's bidding ceased, the only person who competed with Brown for the purchase was the holder of the first mortgage, whose primary interest was to protect the debt secured by that lien. The withdrawal of Schissler as a rival bidder enabled Brown to buy the property at a price three thousand dollars at least below that which would otherwise probably have been procurable. This is a result of which, if the sale is not disturbed, he would receive the benefit while retaining the right to enforce the personal liability of the indorser of the second mortgage note, whose continued competition might have assured a sale for an adequate price.

While a person who voluntarily refrains from bidding at a sale, at the solicitation of the eventual purchaser, may not be able to successfully question the validity of the sale on that ground, the objection being based on his own acquiescence, it is clear, upon the principle of the cases we have cited, that a mortgagor, whose interests are prejudiced by a sale for an inadequate price, is entitled to urge the purchaser's interference with the freedom of the sale as a valid reason why it should be rejected.

On behalf of the purchaser it is argued that if the existence of the alleged understanding with Schissler in reference to the bidding be assumed, there was no impropriety in such an agreement, in view of their mutual interest in the second mortgage on the property, and that consequently the mortgagor has no right to have the sale rescinded on that ground. There may be conditions to which such a theory would apply, but they are not presented by this record. The assumption that an agreement in restriction of the bidding was reached must not disregard the fact that since the sale it has been repudiated. Certainly, the purchaser could not be allowed the benefit of the principle he invokes upon the basis of an agreement which he has refused to perform.

The other objections to the sale need not be discussed. In our opinion they are not substantial, but even if they

should be otherwise regarded, they allege irregularities of procedure which may be obviated before a resale occurs.

It is said that the purchaser received a deed for the property from the trustee long before an appeal bond was filed, and because of that fact it is asserted that a reversal of the order of ratification would not affect the purchaser's title. There have been a number of decisions by this Court applying the Code provision (article 5, section 29) that no appeal from a decree or order in equity shall stay its execution or suspend its operation unless a bond shall be given by the appellant as therein prescribed. The most recent application of the rule was in the case of *Shirk* v. *Soper*, 144 Md. 269. But even though the appeal bond be not seasonably filed, the rule is not available to protect a title vested under a purchase which has been unfairly accomplished. *Raith* v. *Building & Loan Association*, 140 Md. 546; *Garritee* v. *Popplein*, 73 Md. 324; *Lenderking* v. *Rosenthal*, 63 Md. 28. In the cases last cited it was said by this Court that the rule would not permit the title acquired by a purchaser to be defeated by a reversal of the decree of sale or the order of ratification, on an appeal prosecuted without the filing of an appeal bond, unless there was "unfairness or collusion in making the sale by the trustee." The conduct attributed by the evidence to the purchaser in this case brings it within the reason and equity of the principle upon which the exception to the general rule is based.

> *Order reversed and case remanded, the purchaser*
> *as appellee to pay the costs.*