## HARRY K. SMART *v.* R. WALTER GRAHAM, CITY COMPTROLLER, ET AL.

[No. 24, April Term, 1941.]

*Decided June 10th, 1941.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, and FORSYTHE, JJ.

*Philander B. Briscoe,* with whom were *Briscoe & Jones* on the brief, for the appellants.

*Allen A. Davis, Assistant City Solicitor,* with whom was *Charles C. G. Evans, City Solicitor,* for city officials, appellees.

*Norman B. Frost,* with whom was *Charles H. Buck* on the brief, for Scott B. Appleby, appellee.

FORSYTHE, J., delivered the opinion of the Court.

In this case, Harry K. Smart and Fred W. Moe filed a bill of complaint in the Circuit Court No. 2 of Baltimore City, on behalf of themselves, and all other taxpayers who would desire to come in, against the Mayor and City Council, the Board of Estimates, the Commissioners of Finance, the City Comptroller, and the City Solicitor, of Baltimore City, and Charles H. Buck and Scott B. Appleby.

The bill asked for an injunction to restrain the defendants from acting under and in pursuance of an offer to purchase, and a contract of sale, of the Hotel Rennert property in Baltimore City, dated September 17th, 1940, between the City officials of Baltimore City, and the said Scott B. Appleby; that the acceptance and approval of the offer of purchase of the said Appleby be declared void; that the contract of sale with Appleby be declared void, annulled and set aside; that the City Comptroller and Board of Estimates be required to accept for consideration the offer of purchase of the said Harry K. Smart, and such other *bona fide* offers as may be presented; and that the City officials be restrained from executing a deed to the said property to the defendant, Scott B. Appleby.

After answers by all of the defendants and after hearing testimony, the court, on November 1st, 1940, passed a decree dismissing the bill of complaint. It is from that decree this appeal was entered.

The principal facts in the case are undisputed, and at the hearing in this court, the appellants eliminated "such questions as the general powers of ordinary parties to a contract to modify its terms and waive its conditions; the broad discretionary power of municipal officers; and ordinary fraud, which is not alleged." (Appellants' brief, p. 3).

From the record it appears that on April 8th, 1940, the trustee under a mortgage deed of trust sold the Hotel Rennert property, at public auction, to the Mayor and City Council of Baltimore, for the sum of $162,888.16. That amount was offered by the City authorities because it represented the amount of taxes due on the property, and also because it was the lowest amount the trustee, under a decree of court, was permitted to accept. The highest bid obtained at the sale, other than that of the City, was $95,000. A deed for the property was given to the City on May 22nd, 1940.

By an ordinance passed by the Baltimore City Council, and approved by the Mayor on July 10th, 1940, the "City Comptroller was authorized to sell in accordance with section 13, of the Baltimore City Charter, all those two lots of ground * * * known as the Hotel Rennert, said property being no longer needed for public use."

Section 13, of the City Charter, Code Pub. Loc. Laws 1930, art. 4, is as follows: "Nothing contained in this Charter shall prevent the Mayor and City Council * * * from, in any manner, disposing of any building or parcel of land no longer needed for public use; provided, that such disposition shall be authorized and provided for by ordinance, and shall be approved by the Commissioners of Finance by their uniting in the conveyance thereof, and shall be made at public sale, unless a private sale be expressly authorilzed by the Board of Estimates and so entered on their minutes."

In a letter dated July 20th, 1940, the appellant Smart, submitted to the Mayor and City Council an offer "to pay the sum of $115,000.00, in cash, for the Hotel Rennert property, including all improvements and fixtures." The offer was accompanied by a certified check in the sum of $10,000, as a deposit. That offer (Appellants' Exhibit C) was subject to the following terms and conditions: (1) The City was to convey lot A, in fee simple, to Fred W. Moe, or his nominee, and lots B and C to Harry K. Smart, or his nominee; (2) The City must, prior to September 1st, 1940, issue all necessary permits to raze

the buildings on the said lots; (3) The City must, prior to September 1st, 1940, issue all necessary permits for the erection of a filling station on lot A, and for the installation and operation of gasoline pumps and tanks, and for the erection on lots B and C, of a two-story garage with a parking roof; (4) the said offer had to be accepted on, or before, August 1st, 1940.

By a letter of July 31st, 1940, the acting City Comptroller accepted the Smart offer "contingent upon the obtention, before September 1st, 1940, of the permits" mentioned in the offer of July 20th, 1940. The Board of Estimates, on July 31st, 1940, passed a resolution, which appears in its minutes of the meeting of that date, authorizing the City Comptroller to sell at private sale, for the sum of $115,000, the Hotel Rennert property, including all improvements and fixtures, contingent upon the obtention of the above-mentioned permits. The City Council adjourned on August 27th, 1940, without passing the ordinance necessary for the erection of a garage and filling station on the Hotel Rennert property.

Immediately following the refusal of the City Council to pass the ordinance authorizing the issuance of the permits above mentioned, the acting Comptroller, Mr. Dell, talked to Mr. Smart, about the matter. Mr. Dell testified "after the Council refused to pass the ordinance, I called him (Smart) and asked him what to do with the check and Mr. Smart's counsel asked me to hold the check several days; on that occasion Mr. Smart's counsel told me they might be interested in developing a new offer. * * * I was never told by Mr. Smart, or his counsel, that he was interested in the purchase of the property after the Gasoline Ordinance failed; the only conversation I had with Mr. Smart, or his counsel, was when his counsel told me they might develop another offer and they told me to hold the check for $10,000.00. I returned it with a letter by registered mail" (Record, p. 63). In the letter of September 4th, returning the check, Mr. Dell stated "your liability, as well as the liability of the City of Baltimore, in connection with your offer to pur-

chase the Hotel Rennert property, hereupon ceases and determines."

Mr. Dell further testified that on September 7th, 1940, he received a letter dated September 6th, 1940, from Mr. Charles H. Buck, which contained an offer to purchase the Rennert property for $110,000. That letter, and offer, was presented to the Board of Estimates at its meeting on September 10th, 1940. The Buck offer was accompanied by a cashier's check for $10,000. The offer stated that the "principal will agree in said contract of purchase that he will consent to the taxation of said property, for the year 1941, based upon an assessment not in excess of the purchase price, plus the cost of the improvements he contemplates making." The offer also was subject to the condition that an ordinance be passed permitting the erection of a partially closed, and partially open, parking garage. The permit to store, and sell, gasoline was not required. The offer was made for acceptance on, or before, 1 o'clock P. M. on September 10th, 1940, otherwise it was to be considered withdrawn, and the $10,000 check returned.

The Board of Estimates, on September 10th, considered and accepted the Buck offer. Mr. Smart was present at that meeting, and requested an extension of one week, in order to make another offer. His request was refused. When the Buck offer was accepted, it was the only actual offer before the Board of Estimates, and unless accepted by 1 o'clock P. M. of that day, it would have been withdrawn.

The contract of sale following the Buck offer was executed with the principal, Scott B. Appleby, on September 17th, 1940. The contract was in accordance with the terms of the offer of September 6th, except that it contained the following paragraph: "The stipulation in the offer of Charles H. Buck for the purchase of the property on behalf of the Vendee, requiring the passage of an Ordinance by the City Counsel of Baltimore, to permit the use of said property as a partially closed and partially open parking garage, is waived by the Vendee,

without prejudice, however, to the right of the Vendee to make application to the City Council, for such permission, in regular course, after the Vendee shall have paid for said property and become the owner thereof."

On September 24th, 1940, two weeks after the Buck offer had been accepted, and one week after the contract with Appleby had been executed, Mr. Smart submitted another offer to purchase the property for $120,000.

The offer was subject to the following conditions: (1) That the City, prior to December 1st, 1940, issue all permits necessary for the construction on the premises of a three-floor parking and storage building, and for a private bridge over Little Sharp Street, at a nominal cost; (2) That Smart and Moe grant to the City, and waive all interest and title to that part of the premises referred to as a triangular corner of Liberty and Saratoga Streets.

The appellants contend that the sale, to Appleby, should be set aside, (1) because the provisions of the Baltimore City Charter have not been complied with (2) the property was not sold for the highest price obtainable, and was sold for less than the appraised value, (3) that the contract of sale is not valid and enforceable, and (4) because of an erroneous ruling of the court on some of the testimony.

In reference to the first objection, that the sale was not made in full compliane with the City Charter, it appears that on July 10th, 1940, the City Council passed Ordinance No. 268, which is as follows: "Sec. 1. Be it ordained by the Mayor and City Council of Baltimore, That the City Comptroller be and he is hereby authorized to sell, in accordance with Section 13 of the Baltimore City Charter, all those two lots of ground situate, lying and being in the City of Baltimore, State of Maryland, and described as follows, that is to say: * * * The improvements being known as The Hotel Rennert. Said property being no longer needed for public use."

On September 10th, 1940, at a regular meeting of the Board of Estimates, the following resolution was passed

and entered in the minutes: "Resolved: That the City Comptroller be authorized to sell, at private sale, the Hotel Rennert property, in accordance with the terms and upon the conditions, and at the price set forth in the offer dated September 6th, 1940, from Mr. Charles H. Buck."

In connection with this objection, the appellants also assert that the specific terms and conditions of a private sale must be sanctioned by the Board of Estimates. In making that contention, the facts are entirely overlooked. The undisputed facts are that the provisions of the City Charter requiring an ordinance of the City Council was fully complied with by the passage of Ordinance No. 268, which specifically authorized the sale of the Rennert property. That ordinance was followed by the resolution of the Board of Estimates, which expressly provided for a private sale, "in accordance with the terms and conditions, and at the price set forth in the offer of September 6th, 1940, from Mr. Charles H. Buck." The resolution was not merely a general authorization of a private sale, but it included approval of all of the terms and conditions of the sale, and of the amount to be received. That resolution was duly recorded in the minutes of the Board of Estimates of its meeting on September 10th, 1940. Mr. Smart testified (R. p. 94), "I was present on the 10th of September, before the Board of Estimates and I have read the minutes of that meeting which are substantially correct."

Thus it appears that the sale here made was in strict compliance with all legal requirements in so far as the City Charter is concerned. Therefore, the first objection of the appellants cannot be sustained.

The next objection to the validity of the sale raised by the appellants, is that the City Comptroller did not endeavor to secure the highest price obtainable for the property at private sale, and sold it for less than its actual value.

The issue raised by that objection must be considered, and determined, in accordance with all the facts and

circumstances surrounding the transaction. These facts show that the City obtained the Hotel Rennert property, at a public auction, which had been widely advertised in New York, Philadelphia, Washington and Baltimore newspapers. Also, the sale had a great deal of publicity through the news columns of local papers. At the sale, the highest outside bid for the property, including improvements and fixtures, was $95,000. The amount of back taxes due the City was $162,888.16, and the decree of court authorizing the sale expressly provided that the property be not sold for less than that amount. The City bid the said amount of its tax bill, and secured the property. The point is stressed that the City, in attempting to resell the property, did not readvertise it, or place "For Sale" signs on it. It is a matter of common knowledge that the sale of the widely known Hotel Rennert, and all of the circumstances concerning the receivership, taxes due, and its ultimate purchase by the City, had for some time a great deal of publicity through the news columns of daily papers. In view of those facts, it is unreasonable to believe that any real estate brokers in Baltimore City, as well as in nearby cities, were unaware of all the facts surrounding the trustee's sale of April 8th, and that the City desired to resell the Rennert property. Also, it is disclosed by the testimony that the City Comptroller's office had many inquiries. Mr. Dell testified (R. p. 70), "Since the City purchased this property, I judge probably twenty-five or thirty real estate agents, attorneys or other parties dealing in real estate, have been in touch with my office with reference to a prospective offer, or sale, of that property, the Smart offer was the first bona fide offer that we had and that had conditions of the ordinances and so forth, those conditions failed of passage August 26, 1940; from August 26 to 28 we never had any other offer from Mr. Smart until September 24, 1940, in the meantime we had an offer from Buck and it had been accepted." It also appears (Record, p. 62) that other parties were solicited by the City officials with a view to selling the property.

It had been only about five months since it had been extensively advertised in the advertising and news columns of papers in all the large cities near Baltimore. The fact that the most active bidders were out of town men, and that eventually it was sold to one of them, refutes any suggestion that the fact the property was on the market was not widely known.

In reference to the price obtained, it must be borne in mind that the Buck offer was the highest, and the only actual and binding offer before the City Comptroller at the time it was accepted. The previous offer of Smart had not resulted in a sale because the conditions contained in the offer could not be met. The Buck offer, as before stated, contained a provision that it must be accepted, if accepted at all, by 1 o'clock P. M. of September 10th, 1940. Had that offer been rejected, the City would not have had any other offer for the property, and no positive and binding assurance that it ever would receive a better offer. It is true, Smart asked for an extension of a week in which to "develop another offer" (R. p. 85). But he gave no guarantee that he would make another, and better, offer. His request for longer time was not granted for the reason that by so doing the Buck offer would have been lost.

The refusal of the City to grant Smart further time in which to submit another probable offer, does not show a lack of diligence, or care, on the part of the City officials. Smart had his day to bid, and had submitted his bid. It is entirely reasonable to believe that, before submitting his offer, Smart was thoroughly familiar with the Rennert property, and with all the facts and circumstances under which the City acquired it. The reason for further time in which to "develop another offer" is not apparent. The fact that Smart did later make a higher offer presents a situation not unlike that in the case of *Blank v. Frey*, 165 Md. 647, 650, 170 A. 156, 157, where, in speaking for this court, Chief Judge Bond said: "The case appears to this Court to be merely one of higher bids encouraged and produced by the sale

made, rather than obtainable before it. Such subsequent higher bids are common after one bidder and purchaser has led the way, and they naturally give rise to dissatisfaction and doubt of the propriety of the sale, but, to repeat what this Court had occasion to say in several previous cases, when a property has been fairly brought to its market, such as the market is at the time, the subsequent possibilities of obtaining a higher price do not alone furnish sufficient ground for setting aside the sale made. The Court under the authority of which the sale is to be made is not holding an auction, and receiving bids accordingly, up to the time fixed for final ratification, but is to close on the sale reported unless it is objectionable on grounds existing when it was made." *Loft, Inc., v. Seymer,* 148 Md. 638, 129 A. 911; *Kirkpatrick v. Lewis,* 159 Md. 68, 149 A. 614. That principle applies with equal force when municipal authorities, occupying positions of public trust, are dealing with public property.

In *Boyd v. Smith,* 127 Md. 359, 96 A. 526, 528, it is said "to set aside [a] sale * * * upon * * * offers or bids [made after a sale has been consummated], would, in our opinion, be an experiment only, and therefore in opposition to the decisions of this court." *Bank of Commerce v. Lanahan,* 45 Md. 396; *Hunter v. Highland Land Co.,* 123 Md. 644, 91 A. 697. Also, this court has held that where a body, such as the Board of Estimates, is "clothed with discretionary powers, acts within the power conferred by law and without taint of fraudulent, collusive, or arbitrary conduct, its conclusions, even if mistaken, are not reviewable by the courts." *Fuller Co. v. Elderkin,* 160 Md. 660, 154 A. 548, 552. In the opinion of this court, in *Strott v. Broening,* 160 Md. 560, 154 A. 45, 48, Judge Parke, speaking for the court, said, "There is an element of novelty in the theory that a highly controversial matter, admitting of a reasonable difference of honest and informed opinion * * * can be the basis for the losing protagonist to enforce his particular view * * * after the question has been honestly and fairly,

although, perhaps, mistakenly, resolved by the authorized agency." Also, in reference to the charge that the price obtained for the property was inadequate, it must be noted that the offer accepted, plus the amount agreed to be paid in lieu of taxes, brought the price up to $114,-275, whereas the $120,000 offer of Smart included all fixtures, and permit conditions, and nothing in the way of taxes. The Appleby contract did not include fixtures, and waived all conditions as to permit ordinances. The Smart offer did not agree to grant to the City a small triangular lot. But it does not appear that the lot, under all the circumstances, would have been of any particular advantage to the City. The City accepted the best offer, without conditions, ever received, and at the time the Buck offer was being considered, the City officials had no positive assurance they could secure ordinances permitting the use of the property as desired by Smart. The failure of the ordinances offered for that purpose, in connection with Smart's first offer, indicated that such an ordinance could not be obtained.

The evidence in the record of the value of the Rennert property is from real estate experts. The lowest value placed on the property was by the witness Ferguson, called to the stand by the appellee, Appleby. His valuation was $110,775. The City appraisers, Gilbert and Ripe, appraised it at $125,000, and Balachow, the appellants' witness, said it was worth $178,875. This wide difference of opinion among the experts lends considerable doubt as to what, actually, was the true value of the property at the time of its sale to Appleby. According to one of them, it was worth about the amount the City was to receive from Appleby, and according to the City appraisers, it was worth about $10,000 more than the Appleby offer. The value stated by the appellant's witness shows that the price obtained was about $64,600 less than his estimate of its value. But the fact that at a fair and open public auction, five months previously, the highest bid, other than that of the City, was $95,000, seems to indicate very strongly that the esti-

mate of the appellants' witness was greatly in excess of the true value. However, it is the settled principle upon which courts act in dealing with a sale like the present one that it will not be set aside because of difference of opinion among witnesses as to the value of the property, or unless the price received be so grossly inadequate as to indicate a want of reasonable judgment and discretion, or misconduct or fraud, or some mistake or unfairness for which the purchaser is responsible. *Thomas v. Fewster,* 95 Md. 446, 448, 52 A. 750; *Carroll v. Hutton,* 91 Md. 379, 380, 46 A. 967; *McCarthy v. Hamburger,* 112 Md. 40, 44, 75 A. 964.

From all the facts and circumstances of the sale in this case, it does not appear that the City officials, in accepting an offer in hand, rather than speculating as to new offers, acted in an arbitrary or negligent manner, or that poor judgment was used. In fact, had the City officials acted otherwise, they would have been open to criticism for not following the policy approved in many decisions of this court.

The next contention of the appellants is that the contract with Appleby is not valid, and enforcible, because the offer was vague and indefinite, in that it required the passage of an ordinance without limit as to time. That objection needs no consideration since, in the contract, that requirement was waived. Also, the objection that the principal was not disclosed until after the offer had been accepted, is without force. The fact is that the principal was disclosed at the meeting of the Board of Estimates on July 10th (R. p. 49).

The further objection that the provision in the contract, in reference to the payment of a sum of money in lieu of taxes, is invalid, overlooks the terms of that provision. It does not, by any of its terms, establish a new assessment, or fix a tax without regard to the value of the property. It is merely a stipulated sum to be paid in lieu of taxes. The property had produced nothing in the way of taxes for some years, and was not subject to taxes in 1941, and, therefore, whatever the City receives in lieu of taxes, will be a clear gain.

It is also asserted that the contract of sale is vague and uncertain. The principle of law as stated in *Restatement of Law of Contracts*, sec. 297, is that the terms of written contracts must be "reasonably certain," and that the parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. *Thompson v. Gortner*, 73 Md. 474, 482, 21 A. 371; *Williston on Contracts* (2nd Ed.), sec. 47; *Scarlett v. Young*, 170 Md. 358, 362, 185 A. 129. In the contract in this case, the terms used are clear and difinite. It would be difficult to find language which would more clearly express the intentions of the parties. The terms employed can be given their ordinary meaning, and there would be no uncertainty which would be fatal to the enforcement of the contract.

The bill is filed as a taxpayers' bill, and it is contended that the action of the City officials in this matter may result in additional tax burdens. But so far as the record discloses, there is no evidence produced to show that, by reason of this sale, any additional taxes will be required, or that the taxpayers will suffer any injury. It is true that in some cases, courts have granted taxpayers relief against municipal corporations and public officials, but it must be shown that they were acting *ultra vires*, or assuming, and exercising, powers which the law does not confer upon them. It is conceded there was no fraud on the part of the City officials in this matter, and it is clear, as above stated, they were acting entirely within the power conferred upon them by the City Charter, and the ordinance of the City Council. Before the acts of public officials, given discretionary powers, can be condemned, it must be clearly proven that they have acted in an arbitrary and illegal manner, and by reason of such conduct, the taxpayers will suffer injury. *St. Mary's Industrial School v. Brown*, 45 Md. 310; *Williams v. City of Baltimore*, 128 Md. 140, 158, 97 A. 140. There is no evidence in this case which would, in the slightest degree, justify holding that, in the sale of the Rennert property, the City officials acted arbitrarily, or illegally.

At the hearing of the case the appellants noted five exceptions to the ruling of the court on admission of testimony. The first is to the admission of testimony in reference to the manner in which the City officials sold other property after acquiring it at tax sales. Mr. Dell had told of the City buying a great deal of property at tax sales, when he was asked to state the practice in regard to a resale of such property. The answer was that tax sale property was sold, after the passage of an ordinance, at private sale, without advertising. The chancellor admitted the testimony, over the objection of the appellants, with the explanation that since one of the theories upon which the appellants were proceeding was "irregularity amounting to impropriety in what the City did in this case," he thought it admissible as reflecting upon what was done in this case. The information brought out by that testimony did not show unauthorized actions in reference to such sales, but that the procedure was the same as that followed in this case.

While there is some authority for the admission of such testimony under similar circumstances (*Maryland Electric Railways Co. v. Beasley,* 117 Md. 270, 83 A. 157), the general rule is that evidence is not admissible to prove what was customarily done under similar circumstances. *Mutual Fire Ins. Co. v. Ritter,* 113 Md. 163, 178, 77 A. 388. However, the evidence admitted in no wise affected the determination of the main question in this case, and its admission did not injure the appellants' cause. *Dungan v. Mutual Benefit Life Ins. Co.,* 38 Md. 242; *Furness, Withy & Co. v. Randall,* 124 Md. 101, 91 A. 797.

The second exception was to the sustaining of the appellees' objection to the appellants' offer to introduce in evidence Ordinance No. 519. That ordinance provided for public sale only of the Hotel Rennert property. But the ordinance was not passed by the City Council, and it would be admissible for any purpose.

The third, fourth and fifth exceptions were to the introduction, over appellants' objection, of statements in

reference to advertisements of the trustee's sale; of newspaper advertisements; and of items in the news columns of local newspapers. That evidence was clearly admissible. The appellants had charged the City officials with laxity in its efforts to sell the Rennert property, and in failing to give publicity to the fact the property was on the market, the inference being that the public was not aware of the fact the City desired to resell the property. The evidence was relevant to the issue and admissible as presented.

For the reasons above stated, the decree must be affirmed.

*Decree affirmed, appellants to pay the costs.*