# THE WHEELING STEEL AND IRON CO. *vs*. WILLIAM H. EVANS.

*Incomplete Contract—Agreement Lacking an Essential Term.*

The plaintiff company, in reply to an inquiry from defendant, offered to sell one hundred tons of tack plate rolled in grooves at designated prices for different sizes. Defendant replied: "Enter our order for one hundred tons tack plate at price quoted, specifications to follow." Defendant afterwards refused to give any directions as to the sizes required. In an action alleging a breach of contract, *held*, that no definite and complete contract had been made since the reservation to the defendant of the right to designate subsequently what particular sizes of tack he would take, caused an essential term of the agreement to be lacking.

In the above case, defendant's agent, after the correspondence had occurred, orally promised to send specifications. *Held*, that this promise did not give validity to the incomplete contract sued on.

Appeal from the Superior Court of Baltimore City (PHELPS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD and SCHMUCKER, JJ.

*Wm. Reynolds* and *Paul M. Burnett,* for the appellant.

As the learned Judge of the Superior Court held that the contract for the sale of 100 tons of tack iron as disclosed by the evidence was too vague and indefinite as to its subject-matter to be enforced at law, this objection will be first considered. The correspondence shows that the Evans Marble Company agreed to purchase and the appellant to sell to it 100 tons of tack iron plate of Nos. 12, 14, 15 and 16 gauge, the quantity of each gauge to be furnished, to be specified by the purchaser, promptly within a reasonable time, and the plate to be delivered f. o. b. Wheeling, about 25 tons a month, and to be paid for net cash 30 days from date of shipment at the rate of $2.75 per 100 lbs. for Nos. 12 and 14 guage and $2.80 per 100 lbs. for Nos. 15 and 16 guage.

It is thus apparent that the only thing left in anywise uncertain by the correspondence, is how much of the 100 tons of tack plate to be furnished was to be of each of the different gauges therein enumerated, and as this was left optional with the purchaser, it could have made this certain at any time. Indeed, by inserting in its telegram the words, "specifications to follow," it expressly undertook, as a term of its contract, to furnish these specifications promptly and within a reasonable time. To allow the Evans Marble Company to escape its obligation to accept and pay for the 100 tons of tack plate it had ordered, simply because of its failure to perform its other obligation to furnish promptly specifications of the sizes to be sent, would be a monstrous perversion of justice, for it would be allowing it to take advantage of its own wrong.

In *Wells* v. *Alexandre,* 130 N. Y. 642; 15 L. R. A. 218, where the plaintiff had contracted with the defendants to furnish them with a certain grade of coal at a price named for certain steamboats for one year, the Court held that though the quantity of coal to be delivered was indefinite, it was determinable by the terms of the contract, which was therefore complete and valid for the entire year, and that if a notice from the defendant of the quantity of coal required at any particular time was requisite for the proper execution of the contract by

the plaintiff, a covenant to give such notice would be inferred; for any other construction would make the contract unreasonable and place one of the parties entirely at the mercy of the other.   See also *Hinckley* v. *Pittsburg Steel and Iron Co.*, 121 U. S. 264; *McCall* v. *Icks*, 107 Wis. 232; *Walsh* v. *Myers*, 92 Wis. 397; *Minnesota Lumber Co.* v. *Whitebreast Coal Co.*, 160 Ill. 85; *Am. Oil Co.* v. *Kirk*, 68 Fed. Rep. 791; *Crane* v. *C. Crane & Co.*, 105 Fed. Rep. 869; *Cold Blast Transportation Co.* v. *Kansas City Bolt and Nut Co.*, 114 Fed. Rep. 77–81.   And compare the recent case of *Mayor and C. C. of Baltimore* v. *Schaub Bros.*, 96 Md. 534, in which this Court held that the delay of the city chemist in making the analysis required to determine the price to be paid for coal sold and delivered, was no excuse for the failure of the city to make payment for said coal according to the terms of its contract.

*Ferdinand C. Dugan*, for the appellee.

The telegram of the Evans Marble Company not being an acceptance of the plaintiff's offer was simply a conditional proposal to purchase 100 tons of tack iron of such gauges as it should thereafter determine and the acceptance by the plaintiff was an acceptance of a conditional proposal constituted no contract binding on the Evans Marble Company.   The plaintiff could not fill or do anything under the contract until the specifications were sent.   The Evans Marble Company might have ordered an equal amount of each of the different gauges or 97 tons on No. 12 gauge, 1 ton of each of the other gauges— or 99 tons of No. 12 gauge at $2.75 and $\frac{1}{3}$ of No. 14, and $\frac{1}{3}$ of a ton No. 15, and $\frac{1}{3}$ of No. 16, at $2.80 or all of one gauge.

The plaintiff could not tell how much of each gauge the Evans Marble Company would order and consequently any attempt to fill the order or to proceed to manufacture the goods was simply speculative.   The minds of the parties had not met on the number of tons of each gauge that was to be manufactured.   "There can obviously be no sale until the terms upon which it is to be made have been fully determined

and mutually agreed upon—mere negotiation is not enough, the negotiation must have ripened with a completed agreement, and the agreement to be finally settled must comprise all the terms which the parties intend to introduce into it. Where therefore the negotiations have not yet been crystalized into a complete offer and acceptance or where the essential elements such as number, price, term of credit and the like have not yet been settled there can be no sale." *Mechem on Sales*, sec. 234.

The telegram of the Evans Marble Company became an offer with a provision that specifications (meaning a number of each gauge) were to follow and was indefinite. "An offer is not capable of creating legal relations unless it be definite and leave nothing essential for future agreement because the acceptance must be identical with the terms of the offer and if the offer is not definite its acceptance cannot create a contract. If any uncertainty in what purports to be an offer is remedied by the apparent acceptance then the latter is the real offer and itself requires an acceptance." *Brantly on Contracts*, p. 15. Therefore when the plaintiff wrote stating that it would enter the order of the Evans Marble Company it was in reality an offer to sell 100 tons of such tack plate as the Evans Marble Company might specify or designate but which offer was never accepted by the latter.

The plaintiff could not and had no right to proceed to manufacture the tack iron or any part of it until it had received specifications. If any part of the contract is not settled or a mode agreed upon to settle it there would be no contract. *Mayor v. McCreery*, 119 N. Y. 434; *Wardell v. Williams*, 62 Mich. 50; *Gill Manufacturing Co. v. Hurd*, 18 Fed. Rep. 673. This was a suit on a contract to manufacture 100 box cars, and the court said "If the contract was that specifications for the cars should be drawn by the plaintiff and submitted to the defendant for his approval before commencing the construction describing the mode and manner of their construction, then the plaintiff had no right to go on and build them for defendant without such specifications being furnished and accepted."

The plaintiff, however, contends that the failure of the Evans Marble Company to furnish specifications entitles it to recover. Having, however, the right to elect from four different gauges, suppose that there had been depreciation in price of each, how much of each could the Court or jury say that the Evans Marble Company should take? It would simply be speculative. *Thomson* v. *Gortner*, 73 Md. 483; *Dambman* v. *Lorentz*, 70 Md. 383.

McSHERRY, C. J., delivered the opinion of the Court.

This is an action of trespass on the case, instituted by the Wheeling Steel and Iron Company against William H. Evans for a breach by the latter of his alleged warranty of the authority of William J. Driscoll to contract on behalf of the Evans Marble Company for the purchase of one hundred tons of tack plate for the manufacture of tacks. The Evans Marble Company is a corporation of which Evans was president. He was also the owner of nine hundred and ninety-five of the one thousand shares of its capital stock. It is averred in the declaration that Driscoll had made such a contract with the Steel and Iron Company in the name and for the use and behoof of the Marble Company, but that he had no authority to do so and that the Marble Company when sued for a breach of the contract repudiated the contract upon the ground, *first*, that it had not made the purchase, and, *secondly*, that the buying and selling of manufactured iron was not within its corporate powers. It is not claimed that Evans is liable for the price of the iron *as purchaser* of it, but it is insisted that he is answerable for the damages sustained by the Steel and Iron Company by reason of the failure of the Marble Company to take the iron; and that he is so answerable because he warranted that Driscoll had authority to contract for the Marble Company, when in point of fact he had no such authority.

It is obvious at the threshold of the case that if no contract was in reality made by Driscoll for the Marble Company with the Steel and Iron Company, there could not be by any possibility a breach of either an express or an implied warranty of

Driscoll's authority to make that contract; and consequently the first inquiry that suggests itself is this: Was there any legally sufficient evidence adduced to establish such a contract? The Superior Court of Baltimore City ruled that there was no such evidence before the jury, and thereupon peremptorily instructed them to find a verdict for the defendant. From the judgment entered upon that verdict the pending appeal was taken by the Steel and Iron Company.

It appears without contradiction that a copartnership consisting of E. E. Williams and W. J. Driscoll conducted in Baltimore the business of manufacturing tacks, and that they traded under the name of the Southern Tack Company. The concern became indebted to Evans and finally made an assignment, and ultimately the Evans Marble Company continued the business in its own name, with Driscoll as foreman at a salary of ten dollars per week. Several orders were given by the Marble Company to the Steel and Iron Company for tack plates and the prices charged were paid. On September the thirteenth, 1899, the following letter was sent to the Steel and Iron Company:

Baltimore, Knoxville, Chicago.

Evans Marble Company,
          Baltimore                              9–13–'99.

Wheeling Steel & Iron Co.,
          Wheeling, W. Va.

Gentlemen: Please quote us your best price on 100 tons of tack plate from 12 to 17 gauge, regular width, and greatly oblige,          Yours truly,
                              Evans Marble Company,
                                        Baltimore, Md.,
                                                  Driscoll.

On the fifteenth this reply was mailed:

Copy.                    *Wheeling, W. Va.*, Sept. 15th, 1888.

Evans Marble Co.,
          Baltimore, Md.

Gentlemen: Answering your favor of the 13th, we have very little room for more business for prompt shipment. We quote you for 100 tons tack plate rolled in grooves 15 ¼ wide cut about 3 feet lengths for shipment say about 25 tons per month Nos. 12 and 14 $2.72.

                    f. o. b. Wheeling.

No. 15 and 16 $2.80.    Net cash in 30 days from date of shipment.   We have discontinued the making of No. 17 gauge. We make this quotation subject to wire reply not later than Monday, the 18th inst.      Very truly yours,
        (Signed.)                    Wheeling Steel and Iron Co.
    Dictated by H. G. Tinker.

On the twentieth the Marble Company telegraphed :
5 G T C W 21 Paid 5P
                        *Baltimore, Md.*, Sept. 20, 1899.
Wheeling Steel and Iron Co.

Enter our order for 100 tons tack plate if at prices quoted on 15 specifications to follow The Evans Marble Co.

And on the twenty-second this answer was forwarded :
Copy.                    *Wheeling, W. Va.*, Sept. 22d, 1899.
    Evans Marble Co.,
        Baltimore, Md.

Gentlemen : We have your telegram of the 20th inst., and have entered your order for 100 tons of tack plate at prices quoted by us on the 15th inst.
                    Very truly yours,
        (Signed)                    Wheeling Steel and Iron Co.

These papers constitute the contract, if there be a contract at all, for we do not consider that the verbal interview between the general sales agent of the Steel and Iron Company and Driscoll in Baltimore on March the twenty-first, 1900, supplements or makes more definite the written evidence.   This, however, will be alluded to a little later on.

It will be noticed that the telegram of September the twentieth, purporting to have been sent by the Marble Company, is not an acceptance of any antecedent definite offer.   The letter of September the fifteenth quoted the prices of four grades of tack iron, viz.: Nos. 12 and 14 at $2.72 per one hundred pounds, and Nos. 15 and 16 at $2.80 per one hundred pounds ; whilst the telegram of the twentieth simply directed the Steel and Iron Company to enter the Marble Company's order for one hundred tons of tack plate, "specifications to follow."   No specifications, that is to say, no designation of the number of tons of any of the four grades, was ever furnished.   The purchaser, as the Steel and Iron Com-

pany proved, had the right under the contract to elect which sizes it would specify, and whether all the material which was sold was to be paid for at $2.72 or some of it at $2.80 ; and the vendor was unable to tell for want of specifications the exact contract though it regarded the contract as closed for the sale of one hundred tons of tack plate, the purchaser having the option to specify for any or all of the four gauges. This testimony adduced by the vendor correctly interprets the written evidence. If the purchaser had the option to specify for any or all of the four gauges, it is clear that until such specifications had been made there could be no definite agreement ; because it was the purchaser's privilege and right to designate one hundred tons of No. 12, or of No. 14, or of No. 15, or of No. 16; or twenty-five tons of each gauge, or any other of a vast multitude of different proportions of the whole four gauges, or of any two or three of them. The price of each guage was definite ; the total quantity of tons was definite, and the times of delivery were definite ; but the proportion of each gauge, as well as which of the four would be required, is wholly indefinite and uncertain. As to that element of the alleged contract there was obviously no *consensus ad idem.* The telegram of September the twentieth was not a direct and unequivocal acceptance of any definite and unequivocal proposal which by acceptance could become a complete contract. So far as the price and the gross number of tons were concerned the telegram may be treated as an acceptance of an antecedent offer, but the superaddition of the words "specifications to follow" left something essential for future action by the purchaser, and therefore constituted, in legal effect, a new and independent offer requiring an acceptance by the vendor. The test of this lies in considering what would have been the measure of damages in a suit instituted by the vendor against the vendee for a breach of the alleged contract. Would the vendor have been entitled to recover the difference between the contract price and the market price of the whole one hundred tons, reckoned on the basis of $2.80 per hundred pounds ; or on the basis of $2.72 per hundred pounds ; or on some other

basis founded on an arbitrary apportionment of the whole number of tons amongst the four different gauges? And would not the difficulty of fixing a correct measure of damages have sensibly increased if the market price of the four gauges had fallen in an unequal ratio and in different rates of percentage? What quantity of each gauge could a Court or jury declare that the vendee ought to have specified? If either Court or jury had undertaken such a task it would have supplied a term of the contract which the parties themselves failed to incorporate, and manifestly such a proceeding would have been unwarranted. *Thomson* v. *Gortner*, 73 Md. 482.

The case at bar is clearly distinguishable from those cited in the brief of the appellants. Thus in *Wells* v. *Alexandre*, 130 N. Y. 642; s. c., 15 L. R. A. 218, it appeared that an offer to furnish coal for a year at a certain price to three steamers described by name and which were then employed on a particular steamship line, was accepted; and the Court held that the offer thus made and the acceptance of it constituted a definite and binding contract for the amount of coal required to supply those steamers for one year in their ordinary employment. This decision was placed on the distinct ground that the contract itself furnished the means to determine the quantity of coal to be delivered, and therefore there was no uncertainty. But it was argued: that it was "apparent that it could not have been in the contemplation of the parties that the coal should be furnished in one lot, but rather at different times as the steamers required it for their several voyages; nor could the plaintiff know the amount which each steamer would require at the successive loadings. Therefore the defendants were to determine the time and quantity for each delivery, and as the contract contained no promise to give the plaintiff notice the defendants were bound to take only such coal as they notified the plaintiff to furnish." But the Court of Appeals of New York said: "It may be doubted whether there is anything in the record to warrant a determination that the plaintiff would not know the several amounts and times when

coal would be needed, but if it were otherwise we do not deem it controlling.   As we have already said, the evident intention of the parties was that the plaintiff should furnish to the defendants all the coal which the steamers named should require in the work in which they were employed for the year ensuing, and that the parties should perform all needful acts to give effect to the agreement; therefore, if a notice was requisite to its proper execution, a covenant to give such notice will be inferred, for any other construction would make the contract unreasonable, and place one of the parties entirely at the mercy of the other."   This part of the Court's judgment has been strongly relied on in the pending case.   But that contention of the defendants in *Wells* v. *Alexandre*, was an obvious attempt to write into the completed contract a term which it did not contain; whilst here the effort is to treat the telegram of September the twentieth as a definite acceptance of a prior offer and then to permit a Court or jury to speculate as to the proportions of the four gauges which the Marble Company *ought* to have ordered.   In *Wells* v. *Alexandre*, the quantity, quality and price of the coal were definite and the times within which deliveries were to be begun and finished were specifically stated.   The vendor had the right to deliver the whole supply at once and if the vendees wished to avoid that inconvenience they probably might have requested partial deliveries. Notice to make such deliveries would have served their own convenience merely, but the contract was complete and could have been performed without such notice; whereas here there was no perfected contract, because there was designation of the quantity of any of the four gauges of the iron.

In *Hinkley* v. *Pittsburg Steel Co.*, 121 U. S. 264, the contract was for the manufacture of a certain quantity of steel rails at a specified price per ton, to be delivered at designated times, the drilling of the rails to be made as directed by the vendee.   The latter not only neglected to give drilling directions—the drilling being part of the manufacture—but he refused to take the rails.   In a word, he repudiated the contract and he was held liable in damages for the breach.   The

precise point decided was that the request of the vendee to have the delivery of the rails postponed, and also the notice given by him that he was not ready to accept and pay for them, and his assertion that he would decline to take any rails under the contract and that he had made arrangements to purchase rails from other dealers at a lower price, excused the vendor from actually manufacturing and tendering them. The case did not turn upon the mere failure of the vendee to give directions for the drilling of the rails, but upon his flat refusal to abide by the contract. The failure to give drilling directions did not in any way control the vendors, because they could have made the rails and had them ready for being drilled but for the refusal of the vendee to comply with the contract.

It was suggested in the argument here, that to allow the Evans Marble Company to escape its obligation to accept and pay for the one hundred tons of tack plate it had ordered, simply because of its failure to perform its other obligation to furnish promptly, specifications of the size to be sent, would be a monstrous perversion of justice, for it would be allowing it to take advantage of its own wrong. That argument would be clearly right and unanswerable if the premises it includes were accurate. The very point at issue, however, is assumed by the argument as established. If there had been a valid contract, then it would be a serious perversion of justice to permit the Marble Company to escape its obligation by relying on its own wrong. But there can be no escape from an obligation, if no obligation exists; and the fundamental question is, was there an obligation on the part of the Marble Company? If there was not, then no injustice can be done by holding that there was not, but palpable injustice would be inflicted by declaring that there was. Controversies like the pending one can easily be avoided if parties would put their contracts in plain and simple language, leaving nothing to conjecture or speculation. Courts cannot make agreements for persons who are competent to make them for themselves; and when attempts to enter into obligations fail, because of the obscurity of the terms employed, it is far better that the parties be left where they have

placed themselves, than for the judicial tribunals by forced interpretations to construct agreements for them.

Now, as to the verbal interview heretofore alluded to, Mr. Tinker, the general sales agent of the Steel and Iron Company went to Baltimore March 21st, 1900, called at the office of the Evans Marble Company, and inquired for the President, Mr. Evans. He was told by the gentleman in the office that Mr. Evans was out, and then he presented his card and on being asked his business, stated that he wished to see Mr. Evans in regard to the contract which the Wheeling Steel and Iron Company had with them for tack plate. He was told that Mr. Driscoll had charge of that part of the business. The gentleman stepped to the door and pointed out Mr. Driscoll's office, which was in the rear of the Marble Company's yard and upstairs. Tinker told Driscoll that he had come to see why they had not specified for the tack plate they had bought. He answered that the business had been disappointing, and they had not been able to use it. Tinker insisted that they give plaintiff the specifications or pay it the difference between the price at that time and the contract price. Driscoll promised that they would write plaintiff with specifications or a proposition for settlement before April 1st. Plaintiff did not hear further from Driscoll and suit was brought later on. This testimony instead of proving the contract declared on proves merely that Driscoll promised to send specifications, or to settle the demand made by the agent of the Steel and Iron Company. But the suit is founded not on a breach of a contract to send specifications but on an alleged breach of a warranty that Driscoll had authority to bind the Marble Company by a contract.

As we concur in the ruling which withdrew the case from the jury, the judgment appealed against will be affirmed, and it is so ordered.

*Judgment affirmed with costs above and below.*

(Decided June 30th, 1903.)