GEO. BERT. CROPPER, INC. *v.* WISTERCO
INVESTMENTS, INC., ET AL.

[No. 77, September Term, 1978.]

*Decided March 28, 1979.*

*Philip O. Foard,* with whom were *Stephen M. Hearne* and *White, Mindel, Clarke & Hill* and *John J. O'Meara* on the brief, for appellant.

*William G. Duvall* and *Fulton P. Jeffers* for appellee Rufus C. Johnson. No brief filed on behalf of other appellee.

SMITH, J., delivered the opinion of the Court.

This is yet another law suit which stems from the tremendous building expansion on Maryland's bit of seashore

since World War II.[1] This controversy grows out of a joint venture to construct a motel in Ocean City, said to have been intended as a Holiday Inn. Before work on the foundation was completed certain of the joint venturers withdrew.

Two issues are presented in the cross-appeals here before the Court: (1) whether the trial judge erred in finding that a corporation and two individuals were not liable for that part of work done on the motel foundation after it was known by the contractor that they were no longer connected with the building project; and (2) whether the trial judge erred in concluding that cross-appellant Rufus C. Johnson was a legally responsible party in the transaction. We shall affirm on the first issue and reverse on the second. A subsidiary issue is whether the law of partnership is applicable to a joint venture. We conclude that it is.

Perhaps this case may be better understood by listing the litigants and the individuals or corporations directly connected with them:

Geo. Bert. Cropper, Inc. (Cropper, Inc.) — a corporation identified on its letterhead as a registered professional engineer and land surveyor and general contractor, plaintiff below and appellant and cross-appellee here.

George B. Cropper (Cropper) — the principal of Cropper, Inc.[2]

---

1. It seems hard to contemplate that 40 years ago much of the area in Maryland along the Atlantic Ocean south of the Maryland-Delaware State line at Fenwick Island was populated in the summer by only a few "squatters," with no paved road from Delaware to Ocean City proper, making much of the area a wasteland of little value. Even when Maryland got around to putting a road through from the Delaware line to what was then Ocean City it appears to have not proceeded with absolute precision in the matter of obtaining rights-of-way. *See, e.g.,* Fertitta v. Bay Shore Dev. Corp., 266 Md. 59, 291 A. 2d 662 (1972), and Fertitta v. Bay Shore Dev. Corp., 252 Md. 393, 250 A. 2d 69 (1969).

2. Cropper is a Worcester County native who describes himself as a consulting engineer and surveyor. After graduation from Ocean City High School he received a degree in civil engineering from Duke University. He testified that he has been engaged in consulting engineering, surveying and construction since 1938 when he left the Army Corps of Engineers, setting up his own "surveying-consulting engineering practice [in Ocean City] and also dabbl[ing] in real estate . . . ." He stated his first actual job was in about 1928.

Wisterco Investments, Inc. (Wisterco) — a Maryland corporation which is an appellee as to Cropper, Inc.'s, appeal.

Rufus C. Johnson (Dr. Johnson or Johnson) — cross-appellant and principal of Wisterco.[3]

William Randolph Bloxom (Dr. Bloxom or Bloxom) — an appellee who is a Salisbury dentist and resides in Somerset County.

James B. Caine (Caine) — an Ocean City entrepreneur. *See, e.g., Caine v. Cantrell,* 279 Md. 392, 369 A. 2d 56 (1977).

Montego Bay Development Corporation (Montego Bay) — a Caine corporation of which he is president.

Ocean Holiday Investment, Inc. (Ocean Holiday) — a corporation of which Johnson is president.

Lighthouse Sound — another Ocean City enterprise involved with Caine and Johnson.

I

Caine, Johnson, and Bloxom bought the Americana Motel at Ocean City in June 1973. After the end of that season some discussions took place as to the feasibility of acquiring a franchise for a Holiday Inn for that site. On October 6, 1973, Caine, Montego Bay, and Dr. Johnson entered into a long agreement. Caine and Montego Bay were described as "parties of the first part" and Johnson, as "party of the second part." It indicated that they had "agreed in principle to enter into some form of association" with Dr. Bloxom relative to development of three specifically mentioned tracts of land in Worcester County, one of which is the tract here involved. "One or more Holiday Inns or Hotels or Motels" were among the various possibilities mentioned for development.

Johnson said that he became concerned about the size of the project, concluding that he could not afford it. He so

---

3. Dr. Johnson is a resident of Salisbury now retired from his veterinary practice, and President of Maryland State Bank at Bishopville, an unincorporated village of Worcester County near Ocean City with a 1970 population of less than 1,000 people.

advised Caine and Bloxom at a meeting which Johnson said was "friendly"; they offered him a refund of the money which he had put up, "and they even tacked a profit on it." Subsequently Johnson was approached by Caine in an effort to get him back. Johnson then sought the advice of his friend and attorney, Vaughn E. Richardson, Esq., who, as Johnson put it, "was very plain and almost blunt" about the matter. Richardson told Johnson the latter was "not heavy enough to be handling that thing," and the only way in which Richardson would approve his being in the joint venture was through a corporation. Johnson testified further as to the advice given him:

> "From now on any contracts you sign, et cetera, you will have to remember to sign them in that manner," meaning a corporation.

Johnson stated he then reapproached Caine, told him of the advice he had received, and said that the only way he would be involved was through a corporation. This was accepted, according to Johnson, who proceeded accordingly.

Wisterco Investments, Inc., was formed. The first meeting of its board of directors was held on November 13, 1973. A resolution was passed at that meeting authorizing Wisterco "to enter into a partnership with Montego Bay Development Corporation and Dr. William Bloxom for general developmental purposes in the Ocean City area, and to execute any documents necessary to carry out the purposes of that partnership."

Title to some of the land for this project was in the names of Caine, Bloxom, and Johnson and some was in the names of Caine, Bloxom, and Wisterco.

There were negotiations with a Memphis architectural firm. It addressed a letter to Dr. Johnson under date of February 22, 1974, outlining that which it would do by way of preparation of plans for this project and the cost thereof. He was advised that if this were acceptable he should so indicate by executing in the appropriate space at the bottom of the letter. The acceptance was executed by Caine on behalf

of Montego Bay, by Dr. Johnson on behalf of Wisterco, and by Dr. Bloxom.

On January 29, 1974, G.B.C. Surveys, Inc., a Cropper corporation, did a topographical survey of the area in question. In Cropper, Inc.'s, brief it is stated, "Cropper was paid for the survey by a check signed by Johnson." A similar allegation was made at oral argument. This was not Johnson's personal check, but a check of "Lights House Country Club," signed by two persons, Johnson and an individual mentioned in certain phases of the testimony as an employee of Caine.

Cropper testified that Caine "was in [Cropper's] office many times a week, most every day" because of the many jobs that Cropper's corporation was doing for Caine. He apparently talked extensively relative to Lighthouse Sound in which, according to Cropper, Caine said Drs. Bloxom and Johnson were involved. Cropper said Caine "went on at great lengths about how much faith he had in this Lighthouse Sound and he had two heavyweights with him, and they had about 10 million dollars to use on the Lighthouse Sound project . . . ." According to Cropper, Caine claimed to have Holiday Inn franchises for two different locations in Ocean City, one "back of the Carousel" and one "on Block 23," the area here in controversy. There has been no suggestion that this is in any way a part of the Lighthouse Sound project. On this Block 23 location Cropper testified that Caine said an architectural firm in Tennessee, "who were experts on the design of Holiday Inns," had been retained. Cropper said this conversation "was all prior to a definite date of commitment." According to Cropper, the time came when Caine "got very serious." Cropper said that he then reminded Caine of the "$100,000.00 or more on the last section of Montego Bay that [Cropper] fixed for [Caine]" and which was still due to Cropper or one of his corporations. On April 22 Caine called Cropper's office, advised him that he had "plans for the hotel and also the zoning change," and requested Cropper to meet him. This was done. Cropper, Inc., was retained on a time and materials basis to design and construct the foundation. We shall have more to say later about the details of this

agreement. Cropper, Inc., ultimately signed a subcontract with another company for the actual pouring of the concrete foundation pilings, the contract being in the amount of $285,000. The first pile was driven on June 26, 1974. Cropper testified that before he signed the foundation contract with the subcontractor he "called Caine and reaffirmed with him whether the money was okay."

Cropper said that on July 30, 1974, when he was pressing Caine for $126,000 then due on the project, "Caine told [him] that he and his two partners had had a falling out because he had found that they were two lightweights and he didn't want any lightweights in his organization, and he had gotten rid of them," to which Cropper is said to have replied that Caine may have gotten rid of them but Cropper had not and his agreement was with the three of them. In response to a question as to his understanding from the beginning as to how Cropper, Inc., was to be paid, Cropper said:

> [W]e were to be paid on a time and material basis for the work accomplished each month, with no retainage taken out or anything, until such a time that our plans were finalized. And it was understood also that the foundation would be paid for regardless of whether the finalization of the commitment was completed before or after the foundation was put in, but at the time that the overall general contract price was reached. At that time he would then be able to get his final commitment.
>
> In the meantime I would be paid by him and his partners in full each month for the work done.

A letter dated August 14 "submitting a finalized price" on the foundation "in the amount of $556,450" was introduced into evidence. It was addressed to Holiday Inn, Inc. (a non-existent corporation) to the attention of Caine. This was followed by a minor change and a new letter dated August 21, 1974, which was similarly addressed with a similar price. It is signed, "Accepted by James B. Caine." No other signatures appear. There is no indication for whom Caine was signing other than "Holiday Inn, Inc." No title appears

relative to Caine's signature. The date given is August 20, notwithstanding the fact that the letter itself was dated August 21.

On October 1, 1974, Montego Bay, Caine, Wisterco, Ocean Holiday, and Johnson entered into an agreement. It recited that the parties together with Dr. Bloxom had "for some period of time prior to the execution [t]hereof, been engaged in various ventures involving the acquisition of and development of real property in Worcester County," and that the parties had "agreed that Wisterco and Johnson w[ould] withdraw from the various developmental projects contemplated or [then] in progress upon the terms, conditions and understandings [t]hereinafter set forth." A number of projects from which Wisterco and Johnson were withdrawing were mentioned, including "55th Street Holiday Inn . . . ." The detailed financial arrangements set forth in the agreement specified, among other things, that Montego Bay and Caine agreed "to hold Johnson harmless with respect to a certain mortgage from Johnson and others to Gerald F. Bracken, et ux., dated June 1, 1973" involving the land acquired in connection with the original Americana Motel purchase. Reference also was made to yet other mortgages which had been executed by Johnson, apparently in connection with certain of the other projects, with provisions made as to them.

Cropper, Inc., sued Caine, Montego Bay, Wisterco, Johnson, and Bloxom in assumpsit. The narr. contained six common counts and a special count. The special count alleged that Cropper, Inc., "entered into a Contract with the Defendants dated August 21, 1974, for the design and construction of a foundation on property owned or under the control of the Defendants located in Ocean City in Block No. 23 as laid down on the Plat of the Isle of Wight Land Company, Inc." The August 21 letter, to which we have previously referred, was attached as an exhibit. The declaration claimed "that the parties entered into an additional or supplementary contract on October 15, 1974," a copy of which was also attached. It was a letter from Cropper, Inc., to Holiday Inn, Inc., to the attention of Caine making a variation in the foundation plan. It also was alleged

that "at the request of the Defendants, while the construction of the foundation was taking place, [Cropper, Inc.] performed engineering and design work for the superstructure which was contemplated to be placed on the aforesaid foundation, and certain miscellaneous work in removing an old sign on the premises, said work being done on a time and material basis . . . ." The sum of $705,278.29 was claimed.

At trial Cropper, Inc., introduced the deposition of Dr. Bloxom as a part of its case. Counsel for Cropper, Inc., opened the deposition by making inquiry of him as to whether "there c[a]me a time in, say, the spring of 1974, when [he] formed a business entity with Wisterco Investments and James B. Caine for a Holiday Inn project on 52nd [sic] Street . . . ." The information elicited from Dr. Bloxom was to the effect that one-third of the project was owned by Dr. Bloxom, one-third by Caine, and one-third by either Dr. Johnson or Wisterco.

Cropper, Inc., put into evidence the transcript of the public hearing held by the Board of Zoning Appeals of Ocean City on April 4, 1974. The case is entitled:

IN THE MATTER OF THE APPLICATION OF JAMES B. CAINE, FOR A SPECIAL HEIGHT EXCEPTION FOR PROPOSED 210 UNIT MOTEL, TO BE LOCATED ON LOTS 1 THROUGH 10, 12, THROUGH 21 AND 23, BLOCK 23, BEING THE EAST SIDE OF COASTAL HIGHWAY BETWEEN 55th AND 56th STREETS, IN THE TOWN OF OCEAN CITY, MARYLAND.

There Mr. Caine said:

I'm Jim Caine and I live at English Avenue in Ocean City, out in front of the Carousel as my legal home. I am $1/_3$ owner in this project, Dr. William Bloxom, who is here and Dr. Rufus Johnson they own both a third, in the project.

At another point he said that he, "Johnson and Dr. Bloxom . . . [were] trying to . . . put something in Ocean City that Ocean City w[ould] be proud of . . . ."

Cropper has placed substantial reliance on a conversation

at a cocktail party, as did the trial judge. For that reason we shall set forth pertinent parts of the testimony as to that conversation. Cropper testified:

> My first contact with one of the other partners was on June 1st at a party by Mary Nock. I met Dr. Rufus Johnson and in the conversation we were talking about the project that I was doing for them, and I was talking to Dr. Johnson and telling him I was glad I was doing business with people with a lot of money, because Gardner Harrington had had me tied up for about $450,000.00 and I wasn't in a position to carry their projects on a month-to-month basis, and he says, "Well, there is no problem about that. We have got plenty of money." He says, "In fact, we are lending money, and if you have got anybody that needs some money, we would like you to send them to us, because we are — we have got plenty of money."

> As I understand it, he was running the Bishopville Bank. What his title was, I don't know.

> But I had known Dr. Johnson for some time, but that was the first time I had had occasion to talk to Dr. Johnson about the work that I was doing for him and Caine and Bloxom. And our general conversation was along the lines of what we were doing and how we were coming along in our design and that sort of thing.

> \* \* \*

> He told me that he and Bloxom and Caine were in the Lighthouse Sound project, and the Holiday Inn project, and they had a lot to do, and Caine had recommended me very highly to do their work, and because of his recommendation they were more or less going along with him.

> Then we got to talking about his relationship, or he was handling the Bishopville Bank stuff, and he had plenty of money, and there was no question

about the money for their project, because they already had the money for Lighthouse Sound and a commitment in hand, as I understood it, and the commitment for the Holiday Inn.

I told him also that I was very happy they had plenty of money, because I could not afford to spend — invest my own money in any project for Caine any more than I already had, because I had so much out, especially for Harrington, and he assured me that that would not be the case in theirs, that they had plenty of money to pay me.

BY MR. O'MEARA:

Q But, Mr. Cropper, what specifically did he tell you was his relationship to either Mr. Caine and to either Dr. Bloxom?

A That they were equal partners in the whole project.

On cross-examination the record reflects:

Q Again, what was the nature of your conversation which you had with Dr. Johnson?

A Well, it was a casual conversation. We probably just saw each other. I had known Johnson, Dr. Johnson, not too intimately .... I knew him and I had been well informed about him and his relationship with Caine.

\* \* \*

The first thing I knew we were talking about the fact he was also in the banking business and they had plenty of money to lend ....

We got into talking about why I was not going to invest a lot of money into this hotel, because of what Harrington owed me and others, and he talked about Lighthouse Sound and more or less what they were planning on doing.

It was just a general — nobody was trying to down either one. We were just having a good, general conversation, as I remember it.

Q And you said something to the effect — I believe you said, "I was happy to be involved in the project and working with some responsible individuals."

A I certainly did. Yes, I did. I understood from Mr. Caine, by reputation I thought Dr. Bloxom and Dr. Johnson were well-heeled individuals and they were able to stand in back of what they were going to do.

Q And are you personally involved in these contracts, Mr. Cropper?

A I am the owner of George Bert Cropper, Inc.

Q When you were using the first person, you were really referring to your corporation actually?

A Yes, sir.

Dr. Johnson specifically denied ever representing to Cropper at any time that he individually was "a joint venturer in this project." He likewise said that he had not told anyone that he individually was "a partner or venturer or anything else in a project known as Holiday Inn, Inc." His version of the cocktail party conversation is:

We were standing on the porch and he said something to me to the effect, "I understand you are in the project to build the Holiday Inn, and I would like your consideration when it comes time to put out for bids."

I said, "Well, we haven't gotten that far along, but I have heard Jim Caine make some favorable comments about your work."

He said, "Well, tell me who is in the venture, who is building it?"

\* \* \*

I told him Montego, and he said, "Yes, I know. That is Caine." And Dr. William Bloxom, whom he didn't seem to show any recognition of, and Wisterco.

He wanted to know who Wisterco was, and I

simply told him it was a corporation I formed to use for that purpose.

The trial judge found no question but what Caine and Montego Bay were responsible for the total amount claimed. He said that "Bloxom and Wisterco offer[ed] what [was], in effect, no defense to the existence of a partnership," one which Bloxom admitted. Thus, he found "such a relationship and that [Cropper, Inc.] relied on it." He said as to Johnson:

> The Court feels that, based on the statement (even though it is somewhat factually in dispute) made by Johnson to the Plaintiff at the cocktail party; his in depth involvement in dealings with Plaintiff and the Holiday Inn people; the fact that a substantial part of the property involved was in his individual name (title to some of which was taken after the formation of Wisterco); Bloxom thought he (Johnson) was a partner; Caine's statement to Plaintiff that he had two "heavy weights"; Plaintiff's testimony that he was asked by Caine at Caine's office to explain to Johnson why the work was not progressing faster; all this and the other factors testified to make it incumbent upon the Court to conclude that Johnson was also a partner.

He further found that Cropper, Inc., had knowledge "that [the] partnership exist[ing] between Caine, Montego, Wisterco, Johnson and Bloxom . . . ceased to have existence as of July 30, 1974." He observed, "To say that the business arrangements in this transaction were slipshod would have to be the understatement of this decade." He found "the extent of liability of Wisterco, Johnson and Bloxom to be the amount owed as of [July 30, 1974]," $96,394.20. Judgment was entered against Caine and Montego Bay in the amount of $919,000.00 "plus interest accounting from December 31, 1977, and costs." Of that amount judgment was entered against Caine, Montego Bay, Bloxom, Wisterco, and Johnson "jointly and severally" for the first $96,394.20 "plus interest from July 30, 1974, and costs." Cropper, Inc., has appealed. It contends that judgment for the full amount should have

been entered against Wisterco, Johnson, and Bloxom. Dr. Johnson also appealed. He claims he has no liability. We granted certiorari prior to consideration of the case by the Court of Special Appeals.

## II

We shall apply partnership law here in our determination of the controversy since it is partnership law which is applicable to joint ventures. *Madison Nat'l Bank v. Newrath,* 261 Md. 321, 327, 275 A. 2d 495 (1971). *Accord,* 1 J. Barrett and E. Seago, *Partners and Partnerships Law and Taxation* 20 (1956, 1965 Cum. Supp.); A. Bromberg, *Craine & Bromberg on Partnership* § 35 at 192 (1968); and C. Rohrlich, *Organizing Corporate and Other Business Enterprises* 2-53 (5th ed. 1975). Mechem, *The Law of Joint Adventures,* 15 Minn. L. Rev. 644 (1931), after fully discussing joint ventures, concludes:

> There is a law of partnership and that is all. The law of partnership is applied, point for point to all joint adventure controversies, and identical results are reached, under similar circumstances, no matter whether the association is regarded as a partnership or a joint adventure. [*Id.* at 666.]

## III

It will be recalled that at the time Caine informed Cropper that his partners had dropped out of the partnership (July 30, 1974), Cropper, Inc., was just beginning work on constructing the foundation for the proposed motel. In completing the foundation it spent large sums of money. Thus, the issue on Cropper, Inc.'s, appeal is how much of this sum is recoverable from the partners or joint venturers. (When we consider Dr. Johnson's cross-appeal in IV we shall determine whether or not he was a partner.)

The Uniform Partnership Act was enacted in Maryland by Chapter 175 of the Acts of 1916. Its provisions found in Maryland Code (1957) Art. 73A (now set forth without substantial change as Title 9 of Code (1975) Corporations and

Associations Article) are applicable to this proceeding.[4] We find no Maryland statute on the subject of partnerships generally prior to the effective date of that act. Accordingly, the reported opinions of our predecessors on matters arising prior to that time must be read as interpreting the common law on the subject. The opinions of this Court prior to that date which we shall hereafter cite appear to be consistent with the present statutory law.[5]

Cropper, Inc., in its special count referred to a contract "dated August 21, 1974, for the design and construction of a foundation" on the property in question. It will be recalled that this was in the form of a letter addressed to "Holiday Inn, Inc." to Caine's attention. It further will be recalled that only Caine signed acceptance and he did so without specifying in any manner that he was executing for anyone other than himself. When signed by Caine it purported to be a contract "for the fill and main tower foundation necessary [for the] project to be constructed on Block 23 between 55th and 56th Streets in Ocean City . . . ."

The power of a partner to bind a partnership to third persons after dissolution is found in § 9-606. It specifies that a partner may so bind the partnership "[b]y any act appropriate for winding up partnership affairs or completing [partnership] transactions unfinished at dissolution . . . ."

In *Rose v. Coffield*, 53 Md. 18, 22-23 (1880), Judge Miller observed for our predecessors, "It is familiar law, that after dissolution one partner cannot impose new obligations on the firm, or vary the form or character of those already existing. *Ellicott v. Nichols*, 7 Gill, [85,] 100 [(1848)]; *Bell v. Morrison*, 1 Pet. [(26 U. S.) 351,] 370 [, 7 L. Ed. 349 (1828)]." As a matter of fact, in *Ecker v. First Nat. Bank*, 59 Md. 291, 302 (1883), the Court held that after the termination of a partnership the surviving partners could not use the firm name so as to bind

---

4. Since the changes are in style only, henceforth in this opinion when we refer to the provisions of the partnership act by section number the reference will be to Code (1975), Corporations and Associations Article.

5. In Southern Can Co. v. Sayler, 152 Md. 303, 311-12, 313-14, 136 A. 624 (1927), Judge W. Mitchell Digges noted for our predecessors the similarity between sections of the Uniform Partnership Act and prior decisions of this Court.

the estate of a deceased partner for a new note relative to preexisting indebtedness. The power of a partner after dissolution to bind the partnership is explained somewhat in *Seldner v. Mt. Jackson Nat. Bank,* 66 Md. 488, 8 A. 262 (1887), where Judge Robinson said for the Court:

> There is a broad distinction between a waiver under such circumstances, and a promise by a partner, made after the dissolution, to pay a debt barred by the Statute of Limitations. The mere waiver of demand and notice does not, as we have said, create a new liability; whereas to permit a partner to renew a debt barred by the Statute as against his co-partners, by an acknowledgment or a promise to pay made after the dissolution, would be to allow him to create a new liability. [*Id.* at 493-94.]

The authority of a partner in the process of winding up the affairs of a partnership after dissolution is explained in 1 R. Rowley and D. Sine, *Rowley on Partnership,* § 37.2 (2d ed. 1960):

> The rule is universal that a partner has no implied authority to bind his copartners to new contracts after dissolution. Nor does a partner who by agreement is given the power to liquidate firm affairs have authority to create new liabilities, except as it has been held in a few jurisdictions. A guarantee, executed by one partner, that certain accounts receivable which were sold were true and correct was held to be his individual undertaking.
>
> In the course of settling firm affairs, however, some obligations may naturally arise out of dealings previous to the dissolution by which the partners will be bound, such as liability to a surety, on an appeal bond for appeal from a judgment against the firm, who was compelled to pay the judgment, or liability for an excess of money paid to one partner on a firm debt, or liability for compensation for driving logs intermingled with another's logs, or for compensation to an accountant who was engaged by

one partner to audit the firm books, or for attorney's fees. He may charge the partners for expenses reasonably incurred in preserving firm property. [*Id.* at 678-79 (footnotes omitted).]

In 2 J. Barrett and E. Seago, *supra*, C. 8, § 5, in discussing authority of a partner during and after dissolution, it is opined, "The power to issue and endorse negotiable instruments of and for the partnership does not survive dissolution. The logic of this statement is understandable in view of the inability of a partner to create new obligations or vary the nature of existing obligations." *Id.* at 49. In discussing the completion of contracts these authors state in § 5.1:

The completion of outstanding contracts may necessitate the creation of new obligations. Thus, in the case of the completion of a building, it would be necessary to have further quantities of materials and there would be expenditures for labor. [*Id.* at 53.]

\* \* \*

The dissolution of a partnership ends the authority of each partner to enter into new contracts for the partnership so as to thereby bind all of the partners. This prohibition does not extend to matters in which they still have a common interest and for which they are subject to a common liability, for instance, a contract that was not completed at the time of the dissolution. It is the duty of each of the partners to see that such contracts are completed as promptly as possible. [*Id.* at 52.]

*Accord,* A. Bromberg, *supra,* § 80 at 457-58. *See also* Annot. 60 A.L.R.2d 826 (1958).

The type of contract for which a partner may bind the partnership to third persons after dissolution is well illustrated by *Rust v. Chisolm,* 57 Md. 376 (1882). There a

partnership had contracted to erect houses. Judge Robinson said for the Court:

> The death of Glenalvan [, a partner], no doubt operated as a dissolution of the partnership, and the surviving partner had no power to charge his interest with a new contract or new undertaking. This, however, did not prevent the surviving partner from completing a contract made and in part executed in the lifetime of Glenalvan. They had agreed not only to build the houses, but upon the faith of this agreement the appellee had advanced large sums of money to aid them in completing the same. Under such circumstances Levi, the surviving partner, had the right unquestionably to finish the houses, and to charge Glenalvan's interest with its proportion of the expenditures incident thereto. If this be so, then the several sums of money advanced by the appellee under the two mortgages, both before and subsequent to the death of Glenalvan were properly allowed. [*Id.* at 381.]

In *Holloway v. Turner,* 61 Md. 217, 221 (1884), our predecessors approved an expenditure for a bookkeeper for the purpose of keeping the accounts of the business while liquidation was in progress. It would follow from this, as well as from that set forth in the texts cited, that reasonable expenditures for the preservation of the property would be legitimate and could be charged to all of the partners. Here we have none of this. There is no evidence in the record or any suggestion that completion of the foundation in this instance was necessary for the preservation of partnership property.

Given the proposition, as the texts and Maryland cases indicate, that a partner engaged in winding up the affairs of the partnership may not incur any new obligations on the part of the partnership, it follows that Caine was without authority to bind his partners to any new contract when he signed the agreement with Cropper, Inc., for the foundation.

We next examine the situation here to ascertain whether the August 20 or 21 agreement can in any way be regarded

as a continuation of a prior binding contract since § 9-607 (a) makes plain that the dissolution of a partnership does not of itself discharge the existing liability of any partner. Thus, we must inquire as to the nature of the understanding between Cropper, Inc., and the joint venturers. It was a contract on a time and materials basis which meant simply that the partners would pay what was a reasonable sum for the work done each month. It is to be noted that there was to be no "retainage" held out each month and then payable upon completion of the project as is the usual situation where a contract is made for an entire project. It bound the partners to pay at the end of each month for that done during the preceding month, but because it was an agreement for work to be done on a time and materials basis the joint venturers had it in their power to cancel the contract at the end of any month. It simply was not sufficiently explicit to be otherwise enforceable as a contract because there was no firm agreement between Cropper, Inc., and the joint venture. Not only had the price not been determined, but there was no agreement as to the exact work to be done. This Court has said many times that for a contract to be enforceable it is necessary that it be sufficiently specific to enable a court to determine the intention of the parties. *See, e.g., Maryland Supreme Corp. v. Blake Co.,* 279 Md. 531, 539, 369 A. 2d 1017 (1977); *L & L Corporation v. Ammendale,* 248 Md. 380, 385, 236 A. 2d 734 (1968); *Quillen v. Kelley,* 216 Md. 396, 407, 140 A. 2d 517 (1958); *Smart v. Graham, City Comptroller,* 179 Md. 476, 489, 20 A. 2d 574 (1941); *DeBearn v. DeBearn,* 126 Md. 629, 635, 95 A. 476 (1915); *Wheeling Steel Co. v. Evans,* 97 Md. 305, 315-16, 55 A. 373 (1903); and *Thomson v. Gortner,* 73 Md. 474, 482, 21 A. 371 (1891). The facts in *Wheeling* and *Thomson* illustrate the point. In *Wheeling* there had been an exchange of letters and telegrams. Evans directed Wheeling to "[e]nter [its] order for 100 tons tack plate if at prices quoted [in an earlier telegram] specifications to follow." Chief Judge McSherry said for our predecessors, "[W]hen attempts to enter into obligations fail, because of the obscurity of the terms employed, it is far better that the parties be left where they have placed themselves, than for the judicial tribunals by forced interpretations to construct agreements for them."

*Id.* at 315-16. In *Thomson* two notes were given in different amounts. They were to be held until the debt of the maker (a canner) was paid to the payee (possibly a canned goods broker) from sales of canned goods then in the possession of the payee. If the market advanced sufficiently the payee was to declare one of the notes satisfied. If it did not advance sufficiently, then the maker would consider that he owed the whole amount. The trial judge found the agreement void for uncertainty, asking, "[F]rom what point is the advance to be taken? From the contract price or the market price at the time?" *Id.* at 481. This conclusion was upheld by this Court with the comment, "[I]f an agreement be so vague and indefinite that it is not possible to collect from it the full intention of the parties, it is void .... Such a contract can neither be enforced in equity nor sued upon at law." *Id.* at 482. It follows, therefore, that there was no contract to be completed by the joint venture here.

There having been no prior binding contract with Cropper, Inc., and Caine being without authority to execute the contract of August 21, 1974, there could be no recovery against the partners for work done subsequent to July 30, 1974.

## IV

The remaining issue is that presented in Dr. Johnson's cross-appeal, whether the evidence adduced was sufficient to hold him as a partner in this transaction. The case was tried without a jury. Thus, the determination by the trial judge of Dr. Johnson's liability is reviewed bearing in mind the mandate of Maryland Rule 886 that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." On our review we are obligated to consider the evidence produced at trial in a light most favorable to the prevailing party; and if substantial evidence is presented to support the trial court's determination, it is not clearly erroneous and hence will not be disturbed on appeal. *Maryland Metals v. Metzner,* 282 Md.

31, 41, 382 A. 2d 564 (1978), and *Ross v. Hoffman,* 280 Md. 172, 186, 372 A. 2d 582 (1977).

The fact that the controversy here involves a question of partnership does not make it different from a case generally insofar as the burden of proof is concerned. The burden of establishing a partnership is on the party asserting its existence. *M. Lit, Inc. v. Berger,* 225 Md. 241, 247, 170 A. 2d 303 (1961); *Miller v. Salabes,* 225 Md. 53, 55, 169 A. 2d 671 (1961); and *Beard v. Beard,* 185 Md. 178, 185, 44 A. 2d 469 (1945). Thus, in this instance the burden of proof is on Cropper, Inc., since it asserts that Dr. Johnson was a partner.

Rules for determining the existence of a partnership are found in § 9-201. However, other than for its provision that except as provided by § 9-308 "persons who are not partners as to each other are not partners as to third persons," it sheds no light here. Section 9-308 pertains to partnership by estoppel. For discussion of that concept see *Klein v. Weiss,* 284 Md. 36, 66-67, 395 A. 2d 126 (1978).

As he so often did, Chief Judge McSherry wrote incisively for the Court in *Lighthiser v. Allison,* 100 Md. 103, 59 A. 182 (1904):

Now whether a partnership existed between these two Lighthisers depends, if the controversy were between themselves only, upon whether there was a contract between them creating a partnership, because that relation *inter sese* cannot exist against the consent and intention of the parties, *Waring v. Marine Bank,* 74 Md. 278 [, 22 A. 140 (1891)]. But as between them, on the one hand, and the creditor, on the other, it depends, either upon the existence of such a contract, or upon a course of conduct which induced others to believe that they were in fact partners, though as between themselves they might not have been such in reality. A person not a partner in fact may be liable as such to third persons upon the ground that he has held himself out to the world as such, or has permitted others to do so and is therefore estopped from denying that he is one as

against those who have in good faith dealt with the firm, or with him, as a member of it. But it must appear that the person dealing with the firm believed, and had a reasonable right to believe, that the party he seeks to hold as a partner was a member of the firm and that the credit was to some extent induced by this belief. And the holding out must have been by the authority or with the knowledge of the party sought to be charged. *Fletcher v. Pullen,* 70 Md. 205 [, 16 A. 887 (1889)]. This is so self-evident and just a principle that it does not need to be supported by further reference to adjudged cases. It is obvious no one can be charged as a partner where the acts relied on for that purpose are neither his own acts, nor acts of others authorized by or made known to him. Even though it were generally supposed, believed and understood that a person is a partner in a concern, this would be insufficient evidence to prove that he was a partner. *Bryden v. Taylor,* 2 H. & J. 396 [(1809)]. [*Id.* at 105-06.]

There is no written partnership agreement here, but a written agreement is not necessary to create a partnership. *Lit,* 225 Md. at 248. For there to be a partnership contract short of a written agreement to that effect, the underlying test is "the intention of the parties to create a partnership." *Cohen v. Orlove,* 190 Md. 237, 243, 57 A. 2d 810 (1948); *accord, McBriety v. Phillips,* 180 Md. 569, 574, 26 A. 2d 400 (1942); 1 R. Rowley and D. Sine, *supra,* § 6.3 at 45; 59 Am. Jur.2d *Partnership* § 40 at 961 (1971); and 68 C.J.S. *Partnership* § 20 b at 433 (1950). 1 J. Barrett and E. Siego, *supra* (1965 Cum. Supp.), § 2 states:

[T]he ultimate question in determining whether a partnership was formed is always the intention of the parties, although it is sometimes said that the question of intent is relevant only in disputes between the alleged partners, and that the facts are determinative as against third persons. [*Id.* at 6.]

To sustain the position of Cropper, Inc., here as to

Johnson's being a partner, the evidence adduced and the inferences deducible therefrom must rise above surmise or speculation and reach the level of reasonable probability. *Meyers v. Meagher,* 277 Md. 128, 132, 352 A. 2d 827 (1976); *Straughan v. Tsouvalos,* 246 Md. 242, 257, 228 A. 2d 300 (1967); *Ager v. Baltimore Transit Co.,* 213 Md. 414, 421, 132 A. 2d 469 (1957), and cases there cited. This concept was summed up by Judge Miller for our predecessors in *Clarke v. Dederick,* 31 Md. 148 (1869), when the Court said:

> [T]he *legal sufficiency* of the evidence adduced to sustain the issue or to establish any particular fact material to its determination, is a question of law and not of fact; and wherever it is so slight and inconclusive that no rational, well-constructed mind can infer from it the fact which it is offered to establish, it is the duty of the court, when applied to for the purpose, to instruct the jury that there is no evidence before them to warrant their finding the fact thus attempted to be proved. Such has been the uniform language of this court, and such has been the practice prevailing from time immemorial in the courts of this State, and of England, where the same principles of the common law prevail. . . . We have deemed it proper to say this much in view of efforts recently made in this and other cases, to open up again the controversy and discussion which were settled by the elaborate and masterly opinion of Judge Dorsey in *Cole v. Hebb,* [7 G. & J. 20 (1835)]. [*Id.* at 150-51 (emphasis in original).]

*Accord, Cole v. Hebb,* 7 G. & J. 20, 29 (1835), and *Davis v. Davis,* 7 H. & J. 36, 39 (1826).

Aside from any instructions that his attorney may have given him, the manner of execution of the contract with the architect made manifest Dr. Johnson's intention not to be liable individually since it was as president of Wisterco that he executed. The cocktail party conversation between Cropper and Dr. Johnson falls far short of establishing Dr. Johnson as a partner. The fact that some of the land on which the motel was to be built was owned by Dr. Johnson

individually with Caine and Dr. Bloxom is not determinative since § 9-201 provides in pertinent part:

> Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether the co-owners do or do not share any profits made by the use of the property.

As counsel for Johnson so cogently pointed out in his cross-examination of Cropper, the personal pronoun "I" crept into Cropper's testimony when he was discussing corporations which he owned or controlled. This certainly is not an uncommon phenomenon with reference to individuals involved with closely held corporations. Use of the personal pronoun "I" by Dr. Johnson in his discussions with Cropper is not a sufficient basis for concluding that Dr. Johnson personally was involved in this project since he could in fact have been referring to Wisterco, as he indicates. As we said earlier, Cropper wishes to regard the check from Lights House Country Club to G.B.C. Surveys, Inc., as a personal check of Johnson because it had his signature on it. That signature appeared, however, with that of another individual who apparently was delegated by Caine to so sign. In short, this appears to be an account requiring two signatures and Johnson was one of the persons who so signed. This falls far short of being a personal check of Johnson.

We find the evidence adduced here to be entirely too tenuous a ground for a holding that Johnson individually was a partner in this enterprise. The evidence relied upon to demonstrate that Dr. Johnson was a partner simply fails in our view to rise above surmise and speculation and to reach the level of reasonable probability.

> *Judgment against Rufus C. Johnson reversed; judgment entered in favor of Rufus C. Johnson against Geo. Bert. Cropper, Inc., for costs of suit; remaining judgments affirmed; appellant to pay the costs.*